# Illinois Official Reports

## Appellate Court

---

### *People v. Shipp*, 2015 IL App (2d) 130587

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PHILLIP M. SHIPP, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-13-0587 |
| Filed | April 8, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Stephenson County, No. 09-CF-38; the Hon. James M. Hauser, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Alan D. Goldberg and Joshua M. Bernstein, both of State Appellate Defender's Office, of Chicago, for appellant.<br><br>John H. Vogt, State's Attorney, of Freeport (Lawrence M. Bauer and Richard S. London, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel                    JUSTICE BIRKETT delivered the judgment of the court, with
                         opinion.
                         Justices Hutchinson and Hudson concurred in the judgment and
                         opinion.

**OPINION**

¶ 1        Defendant, Phillip M. Shipp, appeals the trial court's summary dismissal of his petition
filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) in
connection with his convictions of possession of cannabis (720 ILCS 550/4(a) (West 2008)),
armed violence (720 ILCS 5/33A-2(a) (West 2008)), unlawful possession of a controlled
substance with intent to deliver (720 ILCS 570/401(c)(2) (West 2008)), unlawful possession
of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2008)), and unlawful use of weapons
(720 ILCS 5/24-1(a)(4) (West 2008)). He contends that he stated a sufficient claim that his
counsel on direct appeal was ineffective for failing to challenge the denial of his motion to
suppress. We agree. Accordingly, we reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3        Defendant was charged after police responded to a report of a fight that possibly included
guns. Defendant was found near the scene with a loaded pistol, cocaine, and cannabis.
Defendant moved to suppress the physical evidence, and a hearing was held. For the most
part, the evidence was undisputed.

¶ 4        The evidence showed that, at around 5 a.m. on January 31, 2009, police officers,
including Jeff Zalaznik, were dispatched to the area of Iroquois Street and Miami Avenue in
Freeport in response to a 911 call about a fight involving weapons, possibly guns. No
information was provided describing the people involved in the fight. None of the officers
witnessed a fight.

¶ 5        Zalaznik arrived at the area less than a minute after the dispatch. He saw two individuals,
defendant and Denise Dickens, walking south in the 500 block of Miami Avenue. The record
indicates that this was less than a block from the intersection of Miami and Iroquois. Another
officer was north, in the 600 block of Miami, talking to an individual. Defendant and Dickens
did not appear to be agitated, sweating, or out of breath, and they were not doing anything
unusual. Their clothing was not disheveled, and defendant did not have any injuries or marks
consistent with a fight. Without leaving his squad car, Zalaznik asked whether they had been
involved in, or knew of, any fights. Defendant and Dickens said "no" and continued walking.

¶ 6        Zalaznik did not activate his lights, but he got out of his squad car and asked defendant
and Dickens to stop. Zalaznik approached them, said that he was investigating a 911 call, and
asked for identification. Dickens asked why he needed identification, and defendant said that
he was just visiting his grandfather. They attempted to walk away, but Zalaznik told them to
stop. Counsel asked Zalaznik whether, during this initial encounter, he told Dickens and
defendant whether they could leave. Zalaznik answered, "I did inform them, yes, that they
were not free to leave at any point until our investigation was finished." He then repeated:

"[W]hen they initially asked me that, you know, why I was stopping them and when I had asked them for identification, then I informed them that they were not free to leave until our investigation was finished." Zalaznik stated that his overall reason for stopping defendant was that, given the time of day, the nature of the call, the area, and the vehicles leaving the area, he suspected that defendant might have been involved in the fight.

¶ 7    While Zalaznik was questioning defendant and Dickens, a van pulled up and two people, later identified as David and Diann Adams, got out of it and yelled to Zalaznik that they were the people who had called 911 and that the people he was looking for were north on Miami Avenue. Zalaznik told them to get back in the van. Officer Sanders then arrived and told the Adams couple to remain in their van. Zalaznik knew the Adams couple from prior police calls and indicated that David had a history of mental issues and violence toward police.

¶ 8    Zalaznik returned his attention to defendant and Dickens, who repeatedly attempted to walk away. Each time they tried to disengage, Zalaznik told them to stop, and they complied. Zalaznik next observed that defendant had his hands in his jacket pockets, and Zalaznik ordered him to remove them. Defendant complied. Zalaznik testified that defendant was not wearing gloves and he agreed that, given the time of year, it was probably cold outside. He said that officers ask people to remove their hands from pockets in the interests of officer safety; if a person puts his hands in his pockets multiple times, he might have a weapon.

¶ 9    Zalaznik again asked defendant and Dickens to provide identification. Defendant stated that he did not have identification on his person but that it was in his truck, which was parked about 20 feet away. Defendant began walking toward the truck, but Zalaznik told him to stop and said that verbal identification would be acceptable. Both provided their names.

¶ 10   Zalaznik radioed the names to dispatch to check whether there were any outstanding warrants. He found out later that there were not. By that time, Officers Shippert and Thompson had arrived on the scene. Zalaznik recognized defendant's name, as defendant had been the alleged victim of a shooting about a month earlier. Zalaznik thought that defendant now might have been looking for revenge. Thompson testified, however, that he thought that defendant had shot himself.

¶ 11   Shippert saw defendant put his hands in his jacket pockets and told him to remove them. Defendant complied. Zalaznik asked defendant whether the officers could conduct a pat-down for weapons. Defendant became agitated, said that he had not done anything wrong, and refused. Defendant then put his hands into his pockets and Zalaznik and Shippert attempted to grab his arms. Zalaznik "did not get a hand on him," but believed that Shippert got his left hand on defendant's arm. Defendant then fled, with Zalaznik running after him, yelling at him to stop. Defendant slipped on some ice and fell, and the officers caught up to him and handcuffed him. A search uncovered a loaded pistol in defendant's pants pocket. They also found cocaine, cannabis, and $560 cash.

¶ 12   Dickens testified that, on January 31, 2009, she had been outside of a party where there were confrontations. She saw defendant standing on Miami Avenue and walked over to him. Defendant told her that he was on his way to his grandfather's house, which was about halfway down the block. Defendant's grandfather was also Dickens' uncle and she decided to go there as well. Zalaznik stopped them and kept asking questions. However, he did not tell them that they could or could not leave.

¶ 13   The trial court denied the motion to suppress, finding that it was unnecessary to determine whether the officers acted properly when they initially questioned defendant,

stopped him, demanded identification, or sought to pat him down. Instead, the court found that, under section 31-1 of the Criminal Code of 1961 (Code) (720 ILCS 5/31-1 (West 2008)) and *People v. Villarreal*, 152 Ill. 2d 368 (1992), defendant resisted or obstructed the performance of a police officer when he fled, making the subsequent search permissible.

¶ 14      On March 11, 2010, the parties agreed to a stipulated bench trial, and the State agreed to dismiss an unrelated charge. The parties entered a written stipulation providing a factual basis for the charges. The stipulation also provided that the trial court would continue to rule as it did on the suppression of evidence and that the court would find defendant guilty of all charges. The stipulation included a recommended sentence for each offense and stated that defendant wished to preserve the suppression issue for appellate review.

¶ 15      In response to a question from the court, both parties agreed that the stipulation was tantamount to a guilty plea. The court admonished defendant in accordance with Illinois Supreme Court Rule 402 (eff. July 1, 1997). Defendant stated that he understood, and the court found him guilty. The parties waived a presentence investigation, and the court sentenced defendant as agreed in the stipulation. The court advised defendant that he had 30 days to appeal. The court did not admonish defendant in accordance with Illinois Supreme Court Rule 605(c) (eff. Oct. 1, 2001), which requires admonishments that, per Illinois Supreme Court Rule 604(d) (eff. July 1, 2006), before a defendant may appeal from a negotiated guilty plea, he must file a motion seeking to withdraw the plea, and any issue not raised in the motion is forfeited. No posttrial motions were filed, and defendant appealed.

¶ 16      On appeal, counsel argued in part that defendant's stipulated bench trial was equivalent to a guilty plea, requiring compliance with Rules 604(d) and 605(c). Counsel did not challenge the denial of the motion to suppress. On October 30, 2012, we rejected the argument that the stipulated bench trial was equivalent to a guilty plea and we granted relief on an unrelated issue. *People v. Shipp*, 2012 IL App (2d) 110265-U.

¶ 17      On February 15, 2013, defendant filed his postconviction petition, alleging that appellate counsel was ineffective for failing to challenge the denial of the motion to suppress, due to counsel's mistaken belief that defendant could appeal only by filing a motion to withdraw a guilty plea under Rule 604(d).

¶ 18      On May 13, 2013, the trial court summarily dismissed the petition as frivolous and patently without merit. Without providing any specific analysis, the court reasoned that the failure to raise the matter on appeal was not objectively unreasonable and that defendant failed to show that, had counsel raised the matter, the convictions would have been reversed. Defendant appeals.

¶ 19                            II. ANALYSIS

¶ 20      Defendant contends that he stated an arguable claim that his appellate counsel was ineffective when he misapprehended the law and thus failed to raise the suppression issue on appeal. The State agrees that counsel misapprehended the law, but argues that the initial stop and attempt to frisk defendant were proper and that defendant was guilty of obstructing justice when he fled, making the ultimate search and seizure valid. Thus, the State argues that, had counsel raised the suppression issue, it would have failed, meaning that defendant cannot show prejudice sufficient to support his postconviction claim. Defendant disagrees

that the stop and attempt to frisk were valid and further argues that his flight did not then allow the police to transform an improper stop into a proper one.

¶ 21 The Act establishes a three-stage process for adjudicating a postconviction petition. *People v. Carballido*, 2011 IL App (2d) 090340, ¶ 37 (citing *People v. Jones*, 213 Ill. 2d 498, 503 (2004)). At the first stage, the trial court must review the petition within 90 days of its filing and decide whether it is either frivolous or patently without merit. *Id*. If the court decides that it is either, it must dismiss the petition in a written order. *Id*.

¶ 22 A *pro se* postconviction petition is frivolous or patently without merit when it has no arguable basis either in law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition has no basis in law when it is based on an indisputably meritless legal theory. *Id*. That means that the legal theory is completely contradicted by the record. *Id*. A petition has no factual basis when it is based on factual allegations that are either fantastic or delusional. *Id*. at 17.

¶ 23 Although the postconviction petition must identify the bases upon which the defendant's constitutional rights were violated, the threshold for first-stage survival is low. *Id*. at 9. The defendant must set forth only the gist of a constitutional claim, which means that the petition contains enough facts to make out an arguable constitutional claim. *Id*. A court must dismiss the petition when the record contradicts the defendant's allegations. *People v. Rogers*, 197 Ill. 2d 216, 222 (2001). We review *de novo* a trial court's first-stage dismissal. *Hodges*, 234 Ill. 2d at 9.

¶ 24 A claim of ineffective assistance of counsel is assessed under the standards articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Brown*, 236 Ill. 2d 175, 185 (2010). Under the Act, the trial court may not summarily dismiss a petition alleging ineffective assistance of counsel if: (1) counsel's performance arguably fell below an objective standard of reasonableness and (2) the defendant was arguably prejudiced as a result. *Id*. The failure to establish either prong of *Strickland* is fatal to the claim. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010). Here, the State concedes that appellate counsel's performance was deficient; it asserts only a lack of prejudice. With respect to appellate counsel's failure to raise an issue, a defendant meets the prejudice prong by showing a reasonable probability that, had counsel raised the issue, the appeal would have succeeded. See *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010).

¶ 25 Here, in denying the motion to suppress, the trial court determined that, regardless of whether the initial stop and attempt to frisk were proper, defendant resisted or obstructed the performance of a police officer when he fled, making the subsequent search and seizure permissible. Because whether the stop and attempted frisk were unlawful is important to a full understanding of the effect of defendant's flight, we address those topics first.

¶ 26                                      A. The Stop

¶ 27 Defendant contends that the stop was unlawful because there was no indication that he had done anything wrong; he was merely in the area of a reported crime. The State contends that defendant's proximity to the area of the call, his refusal to cooperate, and the time of day made the stop appropriate.

¶ 28 On appeal from an order denying a motion to suppress, we use a two-part standard of review. *People v. Miller*, 2014 IL App (2d) 120873, ¶ 25. "The trial court's findings of fact are upheld unless they are against the manifest weight of the evidence." *Id*. Findings are

against the manifest weight of the evidence if they are unreasonable, arbitrary, or not based on the evidence, or if the opposite conclusion is clearly evident. *Id*. That said, the ultimate issue of whether to suppress is a legal one and subject to *de novo* review. *Id*.

¶ 29 The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "This provision applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *People v. Thomas*, 198 Ill. 2d 103, 108 (2001). "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *Id*. However, in *Terry v. Ohio*, 392 U.S. 1, 22 (1968), the United States Supreme Court held that a police officer, under appropriate circumstances, could briefly detain a person for investigatory purposes. *Thomas*, 198 Ill. 2d at 108-09. "Under the *Terry* exception, a police officer may briefly stop a person for temporary questioning if the officer reasonably believes that the person has committed, or is about to commit, a crime." *Id*. at 109.

¶ 30 "Whether an investigatory stop is valid is a separate question from whether a search for weapons is valid." *Id*. The conduct constituting the *Terry* stop must have been justified at its inception, and a court objectively considers whether, based on the facts available to the police officer, the police action was appropriate. *Id*. "To justify the intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant that intrusion." *Id*. "The *Terry* standards have been codified in our Code of Criminal Procedure of 1963." *Id*.; see 725 ILCS 5/107-14 (West 2008).

¶ 31 At the outset, we note that a *Terry* stop occurred when Zalaznik exited his police car, told defendant to stop, and then would not allow him to go on his way.

¶ 32 Under the fourth amendment, a person is seized when an officer, " 'by means of physical force or show of authority,' " restrains a citizen's liberty. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry*, 392 U.S. at 19 n.16). To determine whether a seizure occurred, "[w]e look to the totality of the circumstances to determine whether a reasonable person would feel free to leave under the circumstances." *People v. Beverly*, 364 Ill. App. 3d 361, 370 (2006).

¶ 33 Zalaznik testified that he told defendant that he was not free to leave. He also testified that he stopped defendant from walking away, multiple times. Thus, by his own admission,[1] he restrained defendant by a show of authority, thus effecting a *Terry* stop. See *People v. Jackson*, 389 Ill. App. 3d 283, 288-89 (2009) ("after the third or fourth command," a reasonable person would not feel free to leave). Accordingly, the next question is whether the stop was lawful.

¶ 34 Our supreme court has defined the reasonableness standard for police conduct in the context of a *Terry* stop. The officer must have observed unusual conduct, leading to a reasonable, articulable suspicion that the person has committed or is about to commit a crime. *People v. Kipfer*, 356 Ill. App. 3d 132, 137 (2005). "Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly." *Thomas*, 198 Ill. 2d at 110. "The facts supporting the

[1]Although Dickens testified that Zalaznik did not tell them that they could not leave, she did not suggest that the encounter was consensual.

officer's suspicions need not meet probable cause requirements, but they must justify more than a mere hunch." *Id*. The facts should not be viewed with analytical hindsight. *Id*. Instead, they should be considered from the perspective of a reasonable officer confronted with the situation. *Id*.

¶ 35 We have noted that " '[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.' " *Kipfer*, 356 Ill. App. 3d at 138 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). An individual's location is among the relevant contextual considerations, but it is not enough, by itself, to support a valid stop. *Id*. The lateness of the hour may also be a factor contributing to a reasonable suspicion. *Id*. "However, this factor contributes to suspicion of criminal activity only when there is no legitimate basis for an individual to be in the location at such an hour." *Id*. at 138-39. In addition, a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." (Internal quotation marks omitted.) *Id*. at 140.

¶ 36 In *Kipfer*, a police officer stopped the defendant at about 3:40 a.m. after he saw the defendant come out from behind a dumpster and walk through the parking lot of an apartment complex. The officer did not see the defendant do anything illegal, but the fact that car burglaries had recently occurred in the parking lot caused the officer to become suspicious. The officer made several attempts to get the defendant to stop before he complied. *Id.* at 138. We found that the officer lacked a reasonable articulable suspicion for the stop. The defendant's presence in the parking lot at a late hour was not sufficient to create a reasonable suspicion that the defendant had committed or was about to commit a crime, and the officer failed to articulate any facts to distinguish the defendant from a resident of the apartment complex, a guest of a resident, or a mere passerby. *Id*. We distinguished the case from ones in which the time of day and the location could give rise to a reasonable suspicion, such as where two men wearing black clothing were stopped after emerging from a commercial area at 12:50 a.m. *Id*. at 141 (citing *People v. McGowan*, 69 Ill. 2d 73, 75-76 (1977)).

¶ 37 Here, the facts are very much like those in *Kipfer*. Defendant was walking in a residential area at 5 a.m. Although he clearly wanted to continue on his way, he was not showing signs of attempting to flee the area, and he was not otherwise behaving suspiciously. Thus, the police had no reason to believe that he was involved in a crime.

¶ 38 Although here, unlike in *Kipfer*, the police were responding to a report of a crime, the same result obtains. In *People v. Linley*, 388 Ill. App. 3d 747 (2009), an officer was dispatched to investigate gunfire at a late hour and encountered the defendant in the area. We applied *Kipfer* and invalidated the stop, noting that a defendant's "[p]resence in a residential area–even one known as the site of frequent criminal activity–at a late hour is not enough to warrant an investigatory stop." *Id*. at 752.

¶ 39 It is true that a 911 call carries some degree of reliability. *Id.* at 750-51. Nevertheless, here, the callers did not identify defendant as a person involved or distinguish him from a resident or legitimate visitor to the area. *Cf. Navarette v. California*, 572 U.S. ___, ___, 134 S. Ct. 1683, 1692 (2014) (police validly stopped truck matching 911 caller's description). As there were no facts to tie defendant to the report of criminal activity, the stop was improper.

¶ 40                                    B. The Attempted Frisk

¶ 41     Defendant also argues that, aside from the validity of the stop, the attempt to frisk was unreasonable. We agree.

¶ 42     In order for a frisk to be constitutionally reasonable, (1) the stop must be proper, (2) the officer must have reason to know that the defendant is armed and dangerous, and (3) the scope of the search must be strictly limited to a search for weapons. 725 ILCS 5/108-1.01 (West 2008); *People v. Davis*, 352 Ill. App. 3d 576, 580 (2004). Here, even if the stop had been proper, the police had no grounds to conduct a frisk.

¶ 43     In order to frisk a defendant for weapons, "the officer must reasonably believe that the defendant is armed and dangerous." *Davis*, 352 Ill. App. 3d at 580. "This reasonable belief is met if a reasonably prudent person, when faced with the circumstances that the police confronted, would have believed that his safety or the safety of others was in danger." *Id*. Further, "*Terry* permits a protective search only when the suspect 'is armed and *presently dangerous*.' " (Emphasis in original.) *People v. Walker*, 2013 IL App (4th) 120118, ¶ 47 (quoting *Terry*, 392 U.S. at 24). If a protective search goes beyond what is necessary to determine whether a defendant is armed, it is no longer valid and its fruits will be suppressed. *Id*. ¶ 35.

¶ 44     In *Davis*, the defendant was seen riding his bike at night without a light. After officers stopped him, they observed him fidgeting, looking around frantically, and attempting to " 'dive' " into his right-front pocket. *Davis*, 352 Ill. App. 3d at 578. When the defendant's fingers were inside the pocket, the officers asked to see his hands. The defendant initially complied, but soon again attempted to reach back into his pocket. Fearing for their safely, the officers handcuffed defendant, patted him down, and found a box cutter and contraband. *Id*. On appeal, we found the frisk to be unlawful. We noted that the defendant, by riding his bike at night without a light, was not doing anything to create a reasonable belief that he was armed and dangerous. *Id*. at 581. We also held that his nervousness, while a pertinent fact in determining reasonable suspicion, could not alone justify a frisk. *Id*. Further, the fact that the defendant attempted to put his hand in his pocket could not justify the frisk, as the defendant could have put his hand in his pocket for an innocuous reason, such as to keep warm or locate his identification. *Id*.; see also *People v. Dotson*, 37 Ill. App. 3d 176, 177 (1976) (observations that the defendant kept putting his hand in his pocket, took several steps back, and shifted his weight on his feet did not amount to a proper basis to frisk the defendant).

¶ 45     Likewise, in *Linley*, we held that, even if the stop could be upheld, a protective search of the defendant's clothing could not. There, the defendant was in a high-crime area at a late hour, near the scene of a dispatch call, and the officers believed that the defendant considered fleeing. However, we held that, without reliable information that shots had been fired in the vicinity, there were no particular facts that would lead the officers to believe that the defendant was armed and dangerous. *Linley*, 388 Ill. App. 3d at 753.

¶ 46     Here, although defendant was near the scene of a dispatch call, the people who reported the crime told Zalaznik that the people he was looking for had gone to the north. Thus, the call provided no basis to suspect that defendant was armed. That defendant placed his hands in his pockets was, standing alone, insufficient, especially when it was January and defendant had no gloves. Ultimately, the police had only a subjective hunch or speculation, which is insufficient to support a reasonable belief that a defendant is armed and dangerous. See *Walker*, 2013 IL App (4th) 120118, ¶ 34 ("The reasonableness of the police officer's belief is

measured by an objective standard based upon the facts and circumstances known to the officer at the time of the intrusion."). Thus, the attempted frisk was improper.

¶ 47                                                    C. The Flight

¶ 48        The trial court determined that the legitimacy of the stop and attempt to frisk was irrelevant, finding that defendant was resisting or obstructing a police officer when he fled. Whether a defendant's flight after a police encounter constitutes resisting or obstructing was discussed in *Villarreal* and *People v. Moore*, 286 Ill. App. 3d 649 (1997). Those cases specifically draw a distinction between resisting an unlawful arrest and resisting an unlawful stop.

¶ 49        In *Villarreal*, the defendants were charged with violating section 31-1 of the Code when they attempted to prevent police officers from making a warrantless entry into their residence to arrest a third person. The defendants moved to quash their arrests, arguing that they could not be prosecuted for resisting or obstructing the police when the officers' entry was illegal. On appeal, our supreme court held that, under section 7-7 of the Code (720 ILCS 5/7-7 (West 2008)), the exclusionary rule could not be used to suppress evidence gained as the result of a defendant's resistance to an arrest, even if the arrest was unlawful. *Villarreal*, 152 Ill. 2d at 378-79. That determination was based on the plain language of the statutes at issue. Under section 31-1, "[a] person who knowingly resists or obstructs the performance by one known to the person to be a peace officer *** of any authorized act within his official capacity commits a Class A misdemeanor." 720 ILCS 5/31-1(a) (West 2008). Meanwhile, section 7-7 states that "[a] person is not authorized to use force to resist an arrest which he knows is being made *** by a peace officer ***, even if he believes that the arrest is unlawful and the arrest in fact is unlawful." 720 ILCS 5/7-7 (West 2008). Reading those sections together, it is clear that the legislature intended to prevent individuals from obstructing the performance of an arrest, even if unlawful. *Villarreal*, 152 Ill. 2d at 374. However, that rule has been limited to unlawful arrests and is not applicable when an officer is not undertaking an arrest. Thus, where a police officer is not trying to make an arrest, section 31-1 does not prohibit resistance. See *City of Champaign v. Torres*, 214 Ill. 2d 234, 243 (2005). As a result, in *Moore*, the Third District held that the statutes do not apply in the event of an unjustified *Terry* stop. *Moore*, 286 Ill. App. 3d at 654.

¶ 50        In *Moore*, the defendant fled after officers told him to stop. The defendant was caught and found to have contraband. After determining that the officers did not have a valid reason to stop the defendant, the court addressed whether, under *Villarreal*, the seizure was nevertheless appropriate because the defendant's flight constituted obstruction under section 31-1. The court held that it did not. *Id*. The court noted that a *Terry* stop, without sufficient articulable facts to warrant the stop, is not justified from its inception. *Id*. Further, section 7-7 is limited to circumstances involving an unlawful arrest. Thus, the court found that a person who runs away from an unlawful *Terry* stop is not resisting or obstructing an authorized act of the police officer. *Id*.

¶ 51        We agree with the reasoning of *Moore*. See *People v. Slaymaker*, 2015 IL App (2d) 130528, ¶ 13. Here, under the plain language of sections 31-1 and 7-7, and under *Moore*, the trial court was incorrect when it did not address the validity of the stop and attempted frisk and found that, under *Villarreal*, defendant was resisting or obstructing a police officer. Nothing indicates that the officers were attempting to arrest defendant when they reached out

to pat him down for weapons, and nothing indicates that they would have had a valid reason to arrest him at that point. Thus, the court erred in its application of *Villarreal*.

¶ 52   The State does not discuss *Villarreal*. Instead, relying on *Thomas*, it contends that defendant's flight from the scene was sufficient to justify the subsequent search and discovery of contraband, even when the stop and attempted frisk were unwarranted.

¶ 53   In *Thomas*, a police officer attempted to stop and question the defendant, who was seen riding a bicycle and carrying a police scanner, by blocking the defendant's path with his vehicle. However, the defendant turned down an alleyway and rode away at an accelerated rate. Another officer pursued the defendant, pulled alongside him, and instructed him to stop. Ultimately, the defendant abandoned his bicycle and began to run. The defendant was eventually taken into custody for obstructing a police officer, and a pat-down search uncovered contraband. The trial court granted a motion to suppress, and the appellate court reversed.

¶ 54   Our supreme court affirmed. The court first determined that the officer's initial wish to detain the defendant was based on a suspicion grounded in circumstances that fell short of warranting a stop and that the officer's actions constituted a show of authority. *Thomas*, 198 Ill. 2d at 110. But the court determined that the defendant was not seized within the meaning of the fourth amendment by the attempted roadblock, because he chose to run rather than stop. *Id*. at 112. Thus, the defendant was seized only after he was caught. *Id*. The court noted that, had the defendant stopped when the officer blocked his path and submitted to the officer's show of authority, a seizure offensive to the constitution would have occurred. *Id*. However, the officer's attempt to make an unlawful stop did not implicate the fourth amendment, because the defendant prevented the stop by running away. *Id*. The ultimate stop was not an unreasonable seizure, because the defendant's flight turned the officer's ungrounded suspicion into a suspicion that justified the defendant's detention. *Id*. at 112-13 (citing *Wardlow*, 528 U.S. at 124-25 (unprovoked flight when faced with a potential encounter with the police may raise enough suspicion to justify the ensuing pursuit and investigatory stop)). The court noted that its decision was not a license to conduct investigatory stops in every case in which a person ignores or fails to heed a baseless police order. People have a right to go about their business, and their choice to do so does not authorize a subsequent stop. *Id*. at 114. Thus, *Thomas* has been limited to circumstances of unprovoked flight before a stop occurred, as opposed to flight after an actual unlawful detention. *People v. Estrada*, 394 Ill. App. 3d 611, 620 (2009). In the case of flight after an unlawful detention, "subsequent discoveries or justifications are not sufficient to resuscitate an encounter that lacked justification at the outset." *Id*. at 621. Nor can the basis for the stop arise after the fact or be judged in hindsight. *Id*. at 619.

¶ 55   Here, unlike in *Thomas*, where the defendant fled, unprovoked, at the sight of the police attempting to block his path, defendant initially complied with police instructions to stop and was seized. Thus, unlike in *Thomas*, there was not an unprovoked flight that provided justification for the later seizure. Instead, defendant was stopped unlawfully and the attempt to frisk him was also unlawful. Accordingly, the case does not fall under the limited circumstances of *Thomas*. As the court noted in *Moore*, situations in which defendants were properly seized after their flight from police officers were cases in which the initial actions of the police were justified. See *Moore*, 286 Ill. App. 3d at 654 (citing cases). None of those

cases supported a conclusion that a defendant's flight following an unjustified police action can be the basis of a proper seizure. *Id.* In discussing this, *Moore* quoted Professor LaFave:

> " 'The flight of a person from the presence of police is not standing alone sufficient to establish probable cause, unless of course the circumstances are such that the flight from the officer itself constitutes a crime. Were it otherwise, "anyone who does not desire to talk to the police and who either walks or runs away from them would always be subject to legal arrest," which can hardly "be countenanced under the Fourth and Fourteenth Amendments." ' 2 W. LaFave, Search and Seizure § 3.6(e), at 323-24 (3d ed. 1996)." *Id.*

¶ 56    A search of other jurisdictions reveals additional cases in which the fruits of an unlawful *Terry* stop were suppressed even though the defendant fled during the stop. See, *e.g.*, *United States v. Parker*, 214 F. Supp. 2d 770, 779-80 (E.D. Mich. 2002); *Black v. State*, 642 So. 2d 1147, 1148 (Fla. Dist. Ct. App. 1994). Connecticut also follows a set of rules like those seen in *Villarreal* and *Moore*, in which the timing of the defendant's flight is a key factor. Compare *State v. Oquendo*, 613 A.2d 1300 (Conn. 1992), with *State v. Groomes*, 656 A.2d 646 (Conn. 1995). Cases in which the flight was viewed as an intervening crime or independent basis for a new stop or arrest were based on statutory provisions differing from those interpreted in *Villarreal* and *Moore*, such that the act of fleeing was itself a crime. See, *e.g.*, *United States v. Dawdy*, 46 F.3d 1427, 1430-31 (8th Cir. 1995) (suppression denied when resistance provided independent grounds for arrest); *State v. Williams*, 926 A.2d 340 (N.J. 2007) (interpreting New Jersey's obstruction statute); *Reynolds v. State*, 634 S.E.2d 842, 845 (Ga. Ct. App. 2006) (act of fleeing was a separate crime).

¶ 57    Finally, the State contends that the evidence was nevertheless admissible under *People v. Henderson*, 2013 IL 114040, a case that considered whether the abandonment of a gun during flight from officers broke the causal connection between an illegal stop and the discovery of the weapon, making the exclusionary rule inapplicable.

¶ 58    "Under the exclusionary rule, courts are precluded from admitting evidence that is gathered by the police in violation of the fourth amendment." *People v. Bernard*, 2015 IL App (2d) 140451, ¶ 12. "The fruit-of-the-poisonous-tree doctrine is an outgrowth of the exclusionary rule." *Id.* (citing *Henderson*, 2013 IL 114040, ¶ 33). "Under that doctrine, a fourth-amendment violation is deemed the poisonous tree, and any evidence obtained by exploiting that violation will be suppressed as fruit of that tree." *Id.* (citing *Henderson*, 2013 IL 114040, ¶ 33). The dispositive question is whether, granting the establishment of the primary illegality, the objected-to evidence was obtained by exploiting that illegality or instead by a means sufficiently distinguishable to be purged of the primary taint. *Id.* "Said another way, a court must consider whether the chain of causation proceeding from the unconstitutional conduct became so attenuated, or was interrupted by some intervening circumstance, as to remove the taint imposed by the original illegality." *Id.*

¶ 59    We apply a three-part test to determine whether the causal chain between illegal police conduct and the procurement of the evidence is sufficiently attenuated such that the evidence is admissible: (1) the amount of time that elapsed between the illegality and the acquisition of evidence; (2) any intervening circumstances; and (3) the purpose and the flagrancy of the police misconduct. *People v. Mitchell*, 355 Ill. App. 3d 1030, 1037 (2005) (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). "The rationale for these rules reflects the justification of the exclusionary rule itself–to deter unlawful police conduct." *Id.* "Where the acquisition

of evidence is sufficiently removed from the unlawful police conduct, the deterrent value of excluding it is diminished." *Id.*

¶ 60     In *Henderson*, the defendant fled from a vehicle after an illegal stop and dropped a gun in the process. Our supreme court rejected a "but for" test, under which evidence would be deemed inadmissible simply because it would not have been discovered but for the primary illegality. *Henderson*, 2013 IL 114040, ¶ 34. Instead, it found the case akin to *California v. Hodari D.*, 499 U.S. 621, 626-29 (1991), in which a defendant dropped contraband during flight from officers. Applying *dicta* from *Hodari D.*, the court in *Henderson* noted cases in which flight from officers brought the contemporaneous tossing of contraband outside the scope of the seizure. *Henderson*, 2013 IL 114040, ¶ 43. In such a circumstance, the contraband was not the fruit of the poisonous tree. *Id.*

¶ 61     In comparison, in *Mitchell*, we held that the exclusionary rule applied when, during an illegal stop, an officer discovered that the defendant had an outstanding warrant, and contraband was later discovered during a search at the police station. There, the short time between the arrest and the search, and the fact that the officers stopped the defendant for no apparent reason, favored suppression. We also viewed the misconduct as particularly flagrant, as the stop appeared to be done randomly for the purpose of checking for warrants. *Mitchell*, 355 Ill. App. 3d at 1037-38; see also *United States v. Camacho*, 661 F.3d 718 (1st Cir. 2011) (regardless of the legality of a frisk, the discovery of a gun was so tainted by an illegal stop that it was suppressed).

¶ 62     In *Henderson*, the defendant's immediate flight from a stopped vehicle and his abandonment of the contraband were sufficient to purge the taint of the unlawful stop. Here, by contrast, defendant was simply walking down the street, he submitted to the illegal stop, he was further confronted with an unlawful attempt to frisk, and then he fled, without abandoning anything. This case is more like *Mitchell*. While the police conduct here perhaps was not as flagrant as in *Mitchell*, the stop was essentially based on nothing other than defendant's mere presence in the area. Further, by the time of the attempted frisk, the 911 callers had told the police that defendant was not involved in the crime. Yet the officers insisted on frisking him. Defendant responded by lawfully fleeing, and the officers obtained the contraband only after they chased and tackled him. Thus, the discovery of the contraband was so tainted by the illegal stop that suppression was appropriate.

¶ 63                                    III. CONCLUSION

¶ 64     Defendant stated an arguable constitutional claim of ineffective assistance of counsel. Thus, the trial court erred when it dismissed his postconviction petition. Accordingly, the judgment of the circuit court of Stephenson County is reversed, and the cause is remanded for further proceedings.

¶ 65     Reversed and remanded.