2021 IL App (1st) 173009-U

No. 1-17-3009

Order filed February 18, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 6713 |
| | ) | |
| RYAN MITCHELL, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for armed habitual criminal is affirmed over his contention that the trial court erroneously denied his motion to quash arrest and suppress evidence.

¶ 2    Following a stipulated bench trial, defendant Ryan Mitchell was found guilty of being an armed habitual criminal (AHC) and was sentenced to 10 years' imprisonment. On appeal, defendant argues we should reverse his conviction because the trial court erroneously denied his

motion to quash arrest and suppress evidence, and suppression of the fruits of the search would have left the State unable to prosecute him. For the following reasons, we affirm.

¶ 3     Defendant was charged by information with one count of AHC, one count of unlawful use or possession of a weapon by a felon (UUWF), and three counts of aggravated unlawful use of a weapon (AUUW). Relevant here, the AHC count alleged that on or about April 12, 2015, defendant knowingly or intentionally possessed a firearm after having been convicted of robbery and AUUW (720 ILCS 5/24-1.7(a) (West 2014)).

¶ 4     On May 24, 2016, defendant filed a motion to quash arrest and suppress physical evidence recovered from his person, his statements, and any other direct or indirect evidence resulting from his arrest. He argued that his conduct prior to his arrest could not have been reasonably interpreted by the arresting officers as constituting probable cause that he had committed or was about to commit a crime. He also argued that after his arrest, he was searched and questioned, and during the arrest and subsequent detention, police became aware of the existence of physical evidence and written statements the State intended to use in his prosecution.

¶ 5     At the hearing on the motion, defendant called two witnesses: Lashenda Dillard and Chicago police officer Gomez. Dillard testified that at 12:30 a.m. on April 12, 2015, she was driving with a friend and defendant, who was asleep in the backseat, when she was pulled over by police. Two officers approached Dillard's vehicle and, without speaking to defendant, ordered everyone to get out. The officers had to wake defendant to get him out of the vehicle. Before he was ordered to exit the vehicle, Dillard did not see defendant make any movements in the back seat, and at no point during the evening did she notice a firearm on his person. The officers

searched everyone. The officers placed defendant on the trunk of the vehicle and searched him without presenting an arrest or search warrant.

¶ 6    On cross-examination, Dillard testified that the officers informed her that she was being pulled over as her vehicle did not have a light on her license plate. When the officers approached her vehicle, one went to the driver side, and another went to the passenger side. An officer asked her for her driver's license, which she did not have. When Dillard informed the officer that she was driving on a suspended license and did not have insurance, the officers ordered everyone to exit the vehicle. Both officers searched defendant at the same time by "patt[ing] his sides," during which they recovered a firearm from the "inner thighs" of his pants. Defendant told them he "didn't have anything to do with it," and the officers handcuffed him. Dillard's vehicle was impounded.

¶ 7    Officer Gomez testified that at 12:30 a.m. on April 12, 2015, he and his partner curbed a vehicle for not having a light affixed to its license plate.[1] Defendant, whom Gomez was unfamiliar with at the time, was a passenger in the rear of that vehicle. When Gomez approached the vehicle, he observed that defendant had his right hand inside his right pants pocket. After asking defendant to exit the vehicle, Gomez searched him without an arrest or search warrant. Gomez denied seeing anything that he believed to be a firearm prior to searching defendant.

¶ 8    On cross-examination, Gomez testified that as an officer he carries a firearm and received training in firearms. He approached the passenger side of the curbed vehicle; his partner interacted with the driver. As Gomez approached, he saw defendant's hand in his pocket, which concerned him. When asked why he was concerned about defendant having his hand in his pocket, Gomez stated, "Officer safety. We need to see everybody's hands. We don't know if they are concealing

_____

[1] Officer Gomez's first name does not appear in the report of proceedings.

a weapon or not." Gomez asked to see defendant's hands multiple times and defendant complied after approximately four requests. Additionally, defendant appeared nervous and "kept looking at [Gomez] and [Gomez's] partner."

¶ 9    After learning Dillard did not have a license or insurance, Gomez ordered everyone out of the vehicle. It was still just Gomez on the passenger side of the vehicle. Gomez decided to perform a "[p]at-down" of defendant's "outer garments" to feel for "any objects." Based on his experience and training and defendant's refusal to remove his hand from his pocket while in the vehicle, defendant's "demeanor" made Gomez think his, his partner's, and the passengers' lives "were in danger." Gomez explained, "I don't know what *** state of mind [defendant] was in or if he was concealing a weapon or not." During the search, Gomez felt "an L-shaped type of revolver" in the area where defendant's hand had been. Gomez recognized it was a revolver because he felt its cylinder. Gomez asked defendant what was in his pocket, and defendant responded, "What do you think it is." Gomez placed defendant into custody, recovered a firearm, and impounded the vehicle.

¶ 10    The trial court denied defendant's motion. It found defendant appeared nervous and ignored Gomez's requests to show his hands after multiple requests. The court reasoned that this amounted to "reasonable suspicion" to perform a pat-down search of defendant, a "limited search for a weapon." Defendant was not handcuffed during the search. While patting down defendant's outer garments, Gomez felt an object in the pocket where defendant's hand had been that he immediately knew was a firearm. Defendant then "basically" admitted he had a firearm before Gomez recovered it. The court found Gomez credible and clear and the police conduct proper.

¶ 11    Defendant filed a motion and an amended motion to reconsider the denial of his motion to quash arrest and suppress evidence, which the trial court denied, finding no unreasonable intrusion.

It noted the traffic stop was valid, the vehicle's occupants outnumbered the two officers, defendant refused to show his hands right away, Gomez's observations and encounter with defendant were sufficient for a "quick pat-down," and Gomez immediately felt a revolver on defendant.

¶ 12     The case proceeded to a stipulated bench trial on the AHC count. The State nol-prossed the other charges. The parties stipulated to Gomez's testimony from the hearing on the motion to quash arrest and suppress evidence, and further stipulated that if called for trial, Gomez would testify that the firearm he recovered from defendant was a .32 caliber revolver. The parties also stipulated that defendant had been previously convicted of robbery and AUUW.

¶ 13     The trial court found defendant guilty of AHC. Defendant filed a motion for a new trial, arguing *inter alia* that the court erred in denying his motion to suppress and subsequent motion to reconsider that denial as the police had no legal grounds to order Mitchell out of the vehicle and search his person. The court denied defendant's motion and sentenced him to 12 years' imprisonment. The court subsequently granted defendant's motion to reconsider sentence, reducing his sentence to 10 years' imprisonment.

¶ 14     On appeal, defendant argues we should reverse his conviction because the trial court erroneously denied his motion to quash arrest and suppress evidence, and the State is unable to prosecute him without the fruits of the illegal search. He contends the police lacked probable cause to seize him, asserting his initial lawful detention during the traffic stop became illegal when the police exceeded the scope of the stop. He further contends that, because the police had no reason to believe he was involved in a crime, they should have issued Dillard a citation and ended the encounter. He argues a reasonable person in his shoes would not have felt free to leave when he was ordered from the vehicle, placed on the trunk of the automobile, outnumbered by police two-

to-one, and patted down. In this context, defendant points out that, after finding a firearm on him, the police handcuffed him without asking if he had a Firearm Owner's Identification (FOID) card. Defendant also argues police lacked reasonable suspicion that he was armed and dangerous to conduct a frisk pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).

¶ 15    The State counters the police pat-down of defendant was not an arrest but rather a *Terry* frisk for weapons for which the police did not need probable cause. It argues Gomez articulated the requisite reasonable basis to conduct a *Terry* frisk for weapons. Based on Gomez's observations that defendant appeared nervous and refused to remove his hand from his pants pocket the first three times he was asked, he expressed his concern that defendant was armed, and his belief that the lives of himself, his partner, and the passengers were in danger. The State also points out the vehicle's occupants outnumbered the officers and had to be removed from the vehicle in order for officers to impound it.

¶ 16    On a motion to quash arrest and suppress evidence, the defendant bears the initial burden of establishing that the challenged search or seizure was unlawful. *People v. Shipp*, 2020 IL App (2d) 190027, ¶ 42. If he demonstrates that he was doing nothing unusual at the time of the warrantless search or seizure, *i.e.*, that he was not doing anything indicating criminal activity, the burden shifts to the State to prove the warrantless search was legally justified. *Id.* The ultimate burden of proof, however, remains with the defendant. *People v. Cregan*, 2014 IL 113600, ¶ 23.

¶ 17    When reviewing a challenge to a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Grant*, 2013 IL 112734, ¶ 12. Under this bifurcated standard, we accord great deference to the trial court's factual findings, reversing them only where

we determine they are against the manifest weight of the evidence. *Id.* The trial court's ultimate ruling on the motion to suppress, however, is reviewed *de novo*. *Id.*

¶ 18    The United States and Illinois Constitutions protect citizens from unreasonable searches and seizures by the government. U.S. Const. amends. IV, XIV; Ill. Const. 1970, art. I, § 6; *People v. Lopez*, 229 Ill. 2d 322, 345 (2008). Reasonableness generally requires police to obtain a warrant supported by probable cause for a search or seizure. *People v. Flowers*, 179 Ill. 2d 257, 262 (1997). However, in *Terry*, the United States Supreme Court recognized an exception to the warrant requirement for brief investigatory detentions. *Flowers*, 179 Ill. 2d at 262. Under *Terry*, a police officer may briefly stop a person for temporary questioning if he believes that the person either has committed or is about to commit a crime. *Id.* If necessary, for safety, they may conduct a limited protective search of that person for weapons. *Id.*

¶ 19    In the context of stops following the observation of a traffic violation, it is well established that police may order the stopped vehicle's driver and any passengers out of the vehicle without violating the fourth amendment's protections. *People v. Sorenson*, 196 Ill. 2d 425, 433 (2001). Still, a justified stop does not automatically justify a search. *Id.* In order to conduct a limited search, *i.e.*, a frisk of a person, a police officer "must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). "The sole justification for the search allowed by the *Terry* exception is the protection of the police officer and others in the vicinity, not to gather evidence." *Sorenson*, 196 Ill. 2d at 432. The purpose of this frisk is "to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). If the frisk goes beyond what is necessary to determine if a

person is armed, it is no longer valid under *Terry* and its fruits must be suppressed. *Sorenson*, 196 Ill. 2d at 432.

¶ 20 An officer need not be entirely certain that an individual is armed to frisk him. *Id.* at 433. Instead, the question is whether "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* When evaluating the existence of reasonable suspicion, we must consider the totality of the circumstances. *Navarette v. California*, 572 U.S. 393, 397 (2014). We must also give the officer who conducted the search "due weight to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Sorenson*, 196 Ill. 2d at 433.

¶ 21 The stop of the vehicle in which defendant was a passenger was justified based on Gomez's observation of a traffic violation. As the trial court found, Gomez stopped Dillard's vehicle because her license plate did not have a light affixed to it. After learning that Dillard did not have a license or insurance, Gomez ordered everyone, including defendant, out of the vehicle. Since Gomez ordered defendant out of Dillard's vehicle during a traffic stop, defendant's fourth amendment rights were not violated at that point. See *id.* The question then becomes whether the subsequent frisk was valid. *Id.*

¶ 22 Based on the totality of the circumstances, we find that Gomez's testimony established there was a lawful basis for him to then conduct a *Terry* frisk of defendant. Gomez testified that when he spoke to Dillard regarding her license, defendant appeared nervous in the backseat, looking at Gomez and his partner. Gomez further testified that defendant's hand was inside his right pants pocket. To keep the officers safe, Gomez asked defendant multiple times to show his hands, and defendant refused multiple requests, only complying after fourth request. Additionally,

there were three occupants in Dillard's vehicle, and only two officers conducting the traffic stop. Thus, the vehicle's occupants outnumbered the officers. Gomez stated that he believed that his, his partner's, and the passengers' lives "were in danger" as he did not know what defendant's "state of mind" was, or if he was concealing a weapon. Given Gomez's testimony regarding how his training and experience made him interpret the circumstances of the incident, we conclude that the State established that Gomez had a reasonable suspicion that defendant was armed and dangerous justifying the quick pat-down. The court found Gomez credible and we defer to that finding. See *People v. Hunley*, 313 Ill. App. 3d 16, 28 (2000) (noting that reviewing courts defer to "the factual determination of the trial court in judging witness credibility").

¶ 23    Still, defendant asserts he was illegally seized, and that the *Terry* frisk was improper because case law provides that a person appearing nervous and having his hands in pockets are both insufficient basis to conduct such a search. We initially note that none of the cases defendant cites regarding hands in pockets involve suspects in vehicles. See *People v. Slaymaker*, 2015 IL App (2d) 130528; *In re Rafael E.*, 2014 IL App (1st) 133027; *People v. Shipp*, 2015 IL App (2d) 130587; *People v. Anderson*, 304 Ill. App. 3d 454 (1999); *People v. Smith*, 331 Ill. App. 3d 1049 (2002). Further, while we agree that appearing nervous or having hands in pockets, standing alone, may be insufficient to justify a *Terry* frisk, taken together with the fact that the officers were outnumbered by the vehicle's occupants and defendant refused to show his hands after multiple requests, Gomez's testimony regarding defendant's behavior was enough for the trial court to deny defendant's motion to suppress. See *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 14 (noting that a reviewing court must remember that the decision to make an investigatory stop is based on the totality of the circumstances).

¶ 24 Nor can we say that the frisk of defendant went beyond what was required to determine if he was armed. Gomez testified that he performed a pat-down of defendant's outer garments, including over defendant's pants pocket where defendant had previously kept his hand despite repeated requests to remove it. During the pat-down of that area, Gomez immediately felt what he knew based on his experience as an officer to be the shape and cylinder of a revolver. Thus, the search was limited to what was necessary to determine if defendant was armed and dangerous, and as such was valid under *Terry*. See *Sorenson*, 196 Ill. 2d at 432.

¶ 25 Defendant also argues that police never developed probable cause to arrest him when Gomez felt the revolver in his pocket and then immediately handcuffed him after defendant made a comment Gomez interpreted as confirming the presence of a firearm. Citing *People v. Aguilar*, 2013 IL 112116, he argues merely possessing a firearm outside the home is not a crime. He contends that, therefore, since Gomez asked him no questions regarding whether he was entitled to possess the firearm, including whether he had a FOID card, and police had no information that he illegally possessed the firearm, they lacked probable cause to arrest him after Gomez felt the firearm in his pocket.

¶ 26 A warrantless arrest is valid only if supported by probable cause. *Grant*, 2013 IL 112734, ¶ 11. "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *Id.* The existence of probable cause depends upon the totality of the circumstances at the time of the arrest; and the officer's factual knowledge, based on law enforcement experience, is relevant. *Id.* The determination of whether probable cause exists is governed by commonsense

considerations and concerns the probability of criminal activity, rather than proof beyond a reasonable doubt. *Id.*

¶ 27    As defendant points out, under *Aguilar*, the right to bear arms extends beyond the home. See *Aguilar*, 2013 IL 112116, ¶¶ 19, 21 (striking down a comprehensive ban on carrying "ready-to-use guns outside the home"). The second amendment right to possession of a firearm outside the home is not, however, unlimited, and is subject to "meaningful regulation." *Aguilar*, 2013 IL 112116, ¶ 21. That meaningful regulation includes laws such as the UUWF statute (720 ILCS 5/24-1.1(a) (West 2014)) and the AHC statute (720 ILCS 5/24-1.7(a) (West 2014)), which prohibit felons from possessing firearms. See *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 28. Other regulations include requirements that, in order to possess a handgun, a person must carry a FOID card issued to him by the state police (430 ILCS 65/2 (West 2014)); to carry a concealed firearm, a FOID cardholder also must possess a license under the Firearm Concealed Carry Act (430 ILCS 66/10, 25 (West 2014)). *McMichaels*, 2019 IL App (1st) 163053, ¶ 28.

¶ 28    Given *Aguilar* and the aforementioned regulations, police cannot simply assume a person in possession of a firearm outside the home is involved in criminal activity. *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40. However, as set forth below, based on the totality of the circumstances known to police at the time of defendant's arrest, when Gomez took him into custody after feeling the firearm in his pocket, the fact that the police were not aware of defendant's status as a convicted felon or whether he lacked a FOID card or concealed carry license is not dispositive of whether they had probable cause to arrest him.

¶ 29    As an initial matter, we find this issue is forfeited because defendant raises it for the first time on appeal. See *People v. Haywood*, 407 Ill. App. 3d 540, 551 (2011) ("Generally, a party

forfeits its right to raise an issue on appeal by having failed to raise the issue in the trial court."). Defendant did not raise his *Aguilar*-based probable cause to arrest argument in his motion to quash arrest and suppress evidence or argue it at the hearing on that motion. Nor did defendant raise it in his motion to reconsider when seeking the denial of the motion to quash arrest and suppress evidence.

¶ 30    Defendant did touch on Gomez's failure to inquire about a FOID card or concealed carry license in his subsequent amended motion to reconsider the denial of his motion to quash arrest and suppress evidence. Acknowledging he was making the argument "for the first time," he argued Gomez should have conducted an inquiry as to whether defendant had a valid concealed carry license or FOID card when he searched defendant and felt what he believed to be a firearm. However, defendant made this argument in the context of Gomez's reasonable suspicion to search defendant, contending that because Gomez failed to conduct the inquiry, "the search was impermissible, and the remedy should be suppression of the weapon." Defendant argued that, as Gomez had no information that defendant was involved in a crime or could be armed and dangerous, there was no reason to suspect defendant had a gun and there were *no sufficient grounds for reasonable suspicion to search him*. He did not make the argument he now raises on appeal: that, without further inquiry, Gomez had *no probable cause to arrest* him after feeling the firearm in defendant's pocket. A defendant may not argue on appeal that a motion to suppress should have been granted for reasons not specified in the motion and not argued in the trial court. *People v. Blankenship*, 353 Ill. App. 3d 322, 324 (2004). We cannot consider an issue raised for the first time on appeal, and his argument is therefore forfeited. See *id.*

¶ 31 Even if we consider the issue, we find no error in the court's denial of the motion to quash arrest and suppress evidence.

¶ 32 First, defendant claims "Gomez admitted at the suppression hearing that he asked [defendant] no questions about whether he was entitled to possess the gun, including whether [defendant] had a FOID card." In fact, Gomez made no such admission. When questioned regarding what he did after he felt the firearm in defendant's pocket, he testified he asked defendant what was in his pocket. Gomez did not "admit" he failed to ask defendant whether he lawfully possessed the firearm. The record is silent regarding whether Gomez asked defendant about a FOID card or concealed carry license as defendant did not elicit this information. Defendant never asked Gomez about what he said or asked defendant, let alone whether he asked defendant about a FOID card or concealed carry license. It was defendant's burden to demonstrate the evidence was seized during an illegal search or seizure. *Cregan*, 2014 IL 113600, ¶ 23.

¶ 33 Second, even assuming Gomez did not ask defendant whether he was lawfully in possession of the firearm, a reasonably cautious person could believe defendant illegally possessed the firearm. Defendant acted nervous before exiting the vehicle, refused repeated requests to remove his hand from his pocket, and police then found a firearm in that pocket, from which a reasonably prudent person could conclude there was a probability he was not in lawful possession of the handgun in his pocket. "[T]he existence of a possible innocent explanation, like defendant's possession of the required gun licenses, did not necessarily negate probable cause." *Id.* ¶ 39.

¶ 34 Further, when Gomez asked defendant to show his hands, defendant did not inform him he had a lawful firearm in his pocket. Then, when Gomez felt the firearm and asked defendant what the item was, defendant did not tell him he lawfully possessed the firearm. "A reasonable person

who was not committing a crime (*i.e.*, who had the valid licenses) would be expected to tell the officers he was licensed to have and carry a gun." *McMichaels*, 2019 IL App (1st) 163053, ¶ 38. Defendant had multiple opportunities to volunteer that he lawfully possessed the firearm but did not. In the absence of such information, and given his prior behavior, Gomez was justified in placing defendant into custody before he could confirm defendant was in lawful possession of the firearm. *Id.* ¶ 39 ("even though the officers did not inquire about whether defendant had a valid license, the officers were fully justified in detaining and arresting defendant before they could confirm his licensure and the lawfulness of the possession of the gun without his help").

¶ 35    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 36    Affirmed.