NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210429-U

NO. 4-21-0429

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 14, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| PAUL SANCHEZ, | ) | No. 18CF73 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Carla E. Barnes, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction of felony resisting a correctional officer was affirmed. The trial court committed a clear or obvious error by inadequately questioning potential jurors about the principles contained in Illinois Supreme Court Rule 431(b). However, the evidence was not closely balanced, so defendant was not entitled to relief pursuant to the plain-error doctrine. The trial court conducted an adequate inquiry regarding defendant's *pro se* allegations of ineffective assistance of counsel.

¶ 2    Following a jury trial in the circuit court of Livingston County, defendant, Paul

Sanchez, was convicted of felony resisting a correctional officer (720 ILCS 5/31-1(a), (a-7)

(West 2016)). The court sentenced defendant to 3 years in prison, to be served consecutively to a

71-year sentence that he was already serving for first degree murder and attempted first degree

murder. Defendant appeals, arguing first-prong plain error in that the court conducted an

inadequate inquiry of potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1,

2012). Defendant also contends that the court conducted an inadequate inquiry into his posttrial claims of ineffective assistance of counsel. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4            On May 30, 2017, defendant engaged in a physical altercation with correctional officers at Pontiac Correctional Center. The State charged defendant in a two-count indictment. Count I alleged that defendant committed aggravated battery (720 ILCS 5/12-3.05(d)(4)(i) (West 2016)) by striking "Kent Robinson about the face, knowing Kent Robinson to be a correctional institution employee *** who was engaged in the performance of his authorized duties."

¶ 5            Count II alleged that defendant committed "aggravated resisting a correctional officer." Ordinarily, resisting is a Class A misdemeanor, but it is a Class 4 felony when the defendant's violation is "the proximate cause of an injury" to a correctional institution employee. 720 ILCS 5/31-1(a), (a-7) (West 2016). According to count II, defendant "knowingly resisted the performance of Correctional Officer Joshua Trainor of an authorized act within his official capacity, being the restraining of the defendant." Count II further alleged that (1) defendant knew that Trainor was a "correctional officer engaged in the execution of his official duties," (2) "defendant physically struggled with attempt to restrain [*sic*] from" Trainor, and (3) defendant's actions proximately caused injuries to Trainor's face and torso.

¶ 6                                     A. The Trial

¶ 7            The matter proceeded to a jury trial. Illinois Supreme Court Rule 431(b) requires the court to ask each potential juror whether he or she understands and accepts the following principles:

                "(1) that the defendant is presumed innocent of the charge(s) against him or her;

                (2) that before a defendant can be convicted the State must prove the defendant

guilty beyond a reasonable doubt; [and] (3) that the defendant is not required to offer any evidence on his or her own behalf." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

Unless the defendant objects, the court must also ask each potential juror whether he or she understands and accepts "that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 8 Here, during *voir dire*, the trial court did not ask potential jurors whether they understood and accepted the Rule 431(b) principles. Rather, the court asked potential jurors to raise their hands if they had any "quarrel with" paraphrased versions of these principles. None of the potential jurors raised their hands. Defendant did not object to the court's inquiry of the potential jurors.

¶ 9 Lieutenant Kent Robinson testified that he was the supervisor in charge of the east cellhouse at Pontiac Correctional Center. On May 30, 2017, Officer Josh Trainor escorted defendant out to the yard. When defendant got to the doorway, he asked Lieutenant Robinson why he had to go to a yard that was separate from other prisoners. Lieutenant Robinson replied that this was a decision made by Internal Affairs. Defendant then punched Lieutenant Robinson in the face with a closed fist.

¶ 10 At that point, Lieutenant Robinson saw Trainor tackle defendant to the sidewalk, and defendant's face went "right down into the concrete." Initially, Lieutenant Robinson and Trainor were on the ground with defendant. Other guards then arrived. According to Lieutenant Robinson, "a struggle ensued." Within 20 to 30 seconds, officers secured defendant in handcuffs.

¶ 11 Lieutenant Robinson further testified that he was injured "in this event." Specifically, he suffered a torn labrum (a shoulder injury) that required two surgeries. He also

sustained abrasions and contusions. The State introduced three pictures depicting Lieutenant Robinson after the incident with defendant. One picture shows a small red mark on Lieutenant Robinson's left cheek with some very slight redness around it. Lieutenant Robinson testified that this was where defendant struck him. Another picture shows numerous scrapes on the knuckles of Lieutenant Robinson's right hand. The third picture shows scrapes on one of Lieutenant Robinson's knees. Lieutenant Robinson testified that the injuries on his hand and knee were "concrete burns."

¶ 12        During Lieutenant Robinson's testimony, the State introduced a picture of defendant taken after the incident. In the picture, defendant's nose and almost the entire left side of his face are significantly bruised. Defendant has a swollen lip and a "black eye" that is swollen shut.

¶ 13        During Lieutenant Robinson's testimony, the State also played a surveillance video that had no accompanying audio. The video appears to have been taken from afar by a camera mounted outside a building. The camera was not positioned to capture defendant punching Lieutenant Robinson. Due to the distance from which the video was shot and the appearance of digital text on the video, it is very difficult to ascertain what happened while defendant was on the ground surrounded by guards.

¶ 14        On cross-examination, Lieutenant Robinson acknowledged that his arms and shoulder never contacted defendant during this incident. According to Lieutenant Robinson, when defendant was on the ground with Trainor on top of him, defendant was "combative" and was "resisting" the guards. During that time, Lieutenant Robinson's hands were underneath defendant's body, as Lieutenant Robinson tried to control defendant. Lieutenant Robinson denied striking defendant.

¶ 15 Trainor testified that he took defendant out to the yard on May 30, 2017. Trainor was two or three feet behind defendant as defendant asked Lieutenant Robinson about "why he had to go to the pods by himself." Trainor saw defendant strike Lieutenant Robinson in the face. As defendant tried to strike Lieutenant Robinson a second time, Trainor took defendant to the ground by tackling him. When Trainor and defendant got to the ground, defendant was "resisting the whole time" and "remained combative" despite being ordered by multiple guards to stop resisting. Trainor was unable to subdue or restrain defendant alone, so other guards helped put handcuffs and leg irons on him.

¶ 16 Asked whether he suffered injuries when he tried to "gain compliance and get [defendant] restrained," Trainor responded that he sustained scrapes on his face, elbows, and ear "just from the initial impact of going to the ground." When the prosecutor asked, "Anything after that?", Trainor responded that he "believe[d] some other scrapes had occurred from the struggle on the ground." When the prosecutor followed up by asking, "The rough surface of the concrete?", Trainor replied, "Yes."

¶ 17 The State introduced four pictures depicting Trainor after the incident. Two pictures show Trainor with a small red scrape on the left side of his forehead and some redness on his left ear. In another picture, Trainor has a scrape on his left elbow with some surrounding redness of the skin. In another picture, Trainor has some scrapes and redness on the knuckles of his left hand. The prosecutor asked Trainor whether this last picture depicted "the type of scraping you were talking about from the concrete?" Trainor responded: "From going to the ground. Yes."

¶ 18 On cross-examination, Trainor testified that he was instructed to use force that is necessary and appropriate in each situation. As on direct examination, Trainor again testified that

defendant was resisting during the struggle on the ground despite being ordered to stop. Trainor remained on top of defendant until other guards arrived and helped apply restraints. Trainor denied striking defendant, and Trainor never saw any other guard do so.

¶ 19        On redirect examination, Trainor testified that defendant "remained combative throughout the process until restraints were applied." Specifically, defendant was "fighting" Trainor and other guards by "bucking and stuff like that off the concrete."

¶ 20        Officer Ramone Robinson testified that he secured a gate at Pontiac Correctional Center on May 30, 2017. From about 20 to 25 feet away, he saw Lieutenant Robinson, Trainor, and defendant "going to the ground." Officer Robinson ran to the area and assisted with restraining defendant and applying "mechanical cuffs." Officer Robinson testified that defendant was "engaged in active resisting."

¶ 21        On cross-examination, Officer Robinson testified that he pulled defendant's left arm to restrain him on the ground. Officer Robinson testified that, at some point, another officer named "Carlock" came to the scene as guards restrained defendant in leg irons. Officer Robinson did not strike defendant, nor did Officer Robinson see other guards do so. After the incident, Officer Robinson took defendant to the prison's health care unit.

¶ 22        Defendant presented no testimony during his case-in-chief. However, at defendant's request, the court allowed to be published and passed to the jury the photograph (State's Exhibit 5) depicting defendant's facial injuries after the incident.

¶ 23        The jury found defendant not guilty of aggravated battery for striking Lieutenant Robinson in the face. However, the jury found defendant guilty of the felony version of resisting a correctional officer for resisting and injuring Trainor. The court sentenced defendant to 3 years in prison, which was to be served consecutively to the 71-year sentence he was already serving.

¶ 24                          B. Posttrial Allegations of Ineffective Assistance

¶ 25          After he was sentenced, defendant filed *pro se* documents alleging ineffective

assistance of counsel. As it relates to this appeal, defendant alleged that his counsel was

ineffective for failing to obtain records pertaining to the investigation that the Illinois

Department of Corrections (DOC) conducted after the May 30, 2017, incident. According to

defendant, before trial, he gave his counsel an affidavit from a prisoner named Paul Salgado.

Salgado's affidavit is included in the record. Salgado attested as follows. DOC personnel

interviewed him during the first week of June 2017. Although Salgado did not witness the May

30, 2017, incident, while he was waiting to be interviewed, he heard an unidentified "black 'farm

worker' inmate in a red jumpsuit" claim he saw a white lieutenant "pummell [*sic*] a handcuffed

prisoner pinned on the floor." Salgado informed corrections personnel about what he heard the

other inmate say. When Salgado exited the interview, he saw the farmworker inmate "walk in" to

be interviewed. Nobody ever contacted Salgado about the incident again.

¶ 26          In his *pro se* filings, defendant also referenced an allegedly "newly discovered"

and "exculpatory" affidavit from an inmate named Gregorio Gomez, who purportedly witnessed

the May 30, 2017, incident. The record does not contain a copy of this affidavit, and defendant

alleged that he gave the original affidavit to his counsel after trial. According to defendant,

Gomez attested in his affidavit that defendant "was not resisting and that he relayed this to

investigators (officers) who interviewed him." According to defendant, had counsel conducted a

proper investigation and filed appropriate pretrial motions, counsel would have "discovered not

only Mr. Gomez['s] exculpatory interview but possibly many others as well."

¶ 27          After defendant filed his *pro se* documents, defense counsel filed a motion for a

new trial on defendant's behalf, along with a motion to reconsider the sentence. Before

addressing the two motions filed through counsel, the court conducted an inquiry regarding defendant's allegations of ineffective assistance. The court asked defendant to explain his grievances "in as much detail as you can." Defendant responded that, by filing a posttrial motion, counsel addressed the "core issue" that defendant had with counsel's representation. Defendant initially said he did not feel there was a need to proceed with an inquiry regarding the allegations of ineffective assistance. However, when the court asked defendant if he was certain about that, he said, "I guess I'll proceed with" the allegations of ineffective assistance, "just to cover all bases."

¶ 28 Defendant then told the court that, before trial, he implored counsel to seek discovery of documents relating to DOC's investigation of the incident. Defendant believed that DOC, as opposed to "the State" (*i.e.*, the prosecution), withheld such documents. Defendant said he had discussions with his counsel about this matter before trial.

¶ 29 The court gave defense counsel the opportunity to respond to these allegations. Counsel explained that the State "turned over everything" it had during discovery. Counsel acknowledged having seen Salgado's affidavit before trial, but counsel deemed it hearsay because Salgado merely related what another inmate said. According to counsel: "If I remember correctly, Mr. Gomez gave a similar account where it was hearsay in nature." Accordingly, counsel stated, "it was not a situation where we could present their testimony as to what someone else told them." The court asked counsel: "So you had conversations with your client, and you did not believe that after having those conversations and reviewing said affidavit that they were necessary to proceed to trial or that they would even be admissible. Is that correct?" Counsel responded: "I did not believe they would be admissible, Judge."

¶ 30　　　　　The court gave defendant the opportunity to reply to counsel's comments. Defendant asserted that Gomez "attested in his affidavit that he actually witnessed the incident in question," so his statement was not hearsay. The court asked defendant whether he had "anything further," and defendant said "[n]o."

¶ 31　　　　　The court then ruled:

> "Okay. Mr. Sanchez, [counsel] has a sound understanding of the law. He has a sound understanding of the evidentiary issues as well as how to present a case. I presided over this jury trial, and I can state that his performance was absolutely stellar.
>
> After his representations here today that he did inquire as to your concerns and it was his belief that the statements would have been not admissible in court, he did address your concerns. As such, the Court determines that your claim lacks merit or pertains only to a matter of trial strategy. The inquiry needs to go no further."

¶ 32　　　　　The court then addressed and denied the two motions filed through counsel (the motion for a new trial and the postsentencing motion). Defendant timely appealed.

¶ 33　　　　　　　　　　　　　　II. ANALYSIS

¶ 34　　　　　　　　　　　　A. The Rule 431(b) Inquiry

¶ 35　　　　　Defendant first argues that the court failed to conduct an inquiry of potential jurors in compliance with Rule 431(b). Defendant recognizes that he failed to preserve this argument. However, he maintains that he is entitled to relief pursuant to the first prong of the plain-error doctrine because the trial evidence was closely balanced. The State concedes that the court failed to comply with Rule 431(b) but asserts that the evidence was not closely balanced.

¶ 36    Defendant neither contemporaneously objected to the court's failure to comply with Rule 431(b) nor raised this issue in his postjudgment motion. Thus, defendant forfeited the issue for appeal. *People v. Belknap*, 2014 IL 117094, ¶ 47. A defendant who has forfeited an argument may obtain relief pursuant to the plain-error doctrine in either of two situations. The defendant may demonstrate that "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Belknap*, 2014 IL 117094, ¶ 48. Alternatively, the defendant may demonstrate that "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Belknap*, 2014 IL 117094, ¶ 48.

¶ 37    "A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury." *People v. Sebby*, 2017 IL 119445, ¶ 52. Here, defendant does not claim that there is evidence that the jury was biased. However, "a clear Rule 431(b) violation is cognizable under the first prong of the plain error doctrine." *Sebby*, 2017 IL 119445, ¶ 72. Defendant invokes the first prong by arguing that the evidence was closely balanced.

¶ 38    The parties are correct that the trial court here committed a clear or obvious error by failing to comply with Rule 431(b). As our supreme court has explained:

> "Rule 431(b) *** mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from

each prospective juror on their understanding and acceptance of those principles." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

It is insufficient to do what the trial court did here: merely asking potential jurors whether they have any quarrel with the principles. *Belknap*, 2014 IL 117094, ¶ 46.

¶ 39        The dispositive question then becomes whether the evidence was closely balanced. See *Sebby*, 2017 IL 119445, ¶ 69 ("The only question in a first-prong case, once clear error has been established, is whether the evidence is closely balanced."). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. This "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53. "Whether the evidence was closely balanced 'depends upon the quantum of evidence presented by the State against the defendant.' " *People v. Moore*, 2020 IL App (1st) 182535, ¶ 22 (quoting *People v. Herron*, 215 Ill. 2d 167, 193 (2005)).

¶ 40        "A person who knowingly resists or obstructs the performance by one known to the person to be a *** correctional institution employee of any authorized act within his or her official capacity commits a Class A misdemeanor." 720 ILCS 5/31-1(a) (West 2016). However, "[a] person convicted for a violation of this Section whose violation was the proximate cause of an injury to a *** correctional institution employee is guilty of a Class 4 felony." 720 ILCS 5/31-1(a-7) (West 2016). "Resist" means " 'to withstand the force or the effect of' or the exertion of 'oneself to counteract or defeat.' " *People v. Baskerville*, 2012 IL 111056, ¶ 25 (quoting Webster's Third New International Dictionary 1932 (1961)). "Thus, 'resist' implies some type of physical exertion in relation to the officer's actions." *Baskerville*, 2012 IL 111056, ¶ 25. Where

the State alleges that the defendant committed the felony version of resisting, proximate cause of an injury is an element of the offense that the State must prove beyond a reasonable doubt. *People v. Cervantes*, 408 Ill. App. 3d 906, 908 (2011). The State must prove that the defendant's conduct was a contributing cause of an injury, not necessarily the sole cause. *Cervantes*, 408 Ill. App. 3d at 910.

¶ 41           On appeal, the parties do not dispute that Trainor and the other guards who testified were correctional institution employees who acted in their official capacities and performed authorized acts when they encountered defendant on May 30, 2017. The only disputed elements are whether defendant knowingly resisted the guards' performance and whether such violation proximately caused an injury to Trainor.

¶ 42           Defendant argues that the evidence was closely balanced because "the testimony as to [his] alleged acts of resistance was vague and there was no specific or corroborating evidence to demonstrate that [his] actions were the proximate cause of the injuries sustained by Correctional Officer Trainor." Defendant asserts that none of the guards described defendant's actions in detail, other than saying that he was "resisting" or "combative." Additionally, defendant maintains that there was no testimony about how his actions caused the scrapes that Trainor sustained during the incident. On that point, defendant proposes that "[i]t is far more likely that the scrapes on Trainor's knuckles were caused, not by any actions of [defendant], but by Trainor's violent take down of [defendant] and his slamming [defendant's] face to the ground." According to defendant, the surveillance footage that the State introduced did not corroborate the charge against him, as little of note is discernible in the video. Defendant further claims that "the dubious nature" of the guards' testimony was "evident" in the fact that the jury acquitted him of aggravated battery for punching Lieutenant Robinson.

¶ 43　　　　In arguing that the evidence was not closely balanced, the State notes that three guards testified, without contradiction, that defendant resisted after he was taken to the ground. Moreover, the State emphasizes that Trainor "indicated that he suffered some scrapes due to the struggle on the ground." Although the State acknowledges that the evidence regarding Trainor's injuries was not overwhelming, the State contends that Trainor testified credibly. Responding to defendant's argument that Trainor may have been injured during the initial takedown rather than from defendant's resistance on the ground, the State says that Trainor testified that he landed on top of defendant. Accordingly, the State reasons that "Trainor received his injuries when he attempted to detain defendant."

¶ 44　　　　We determine that the evidence was not closely balanced as to whether defendant resisted the guards. Lieutenant Robinson testified that defendant was "combative" and was "resisting" the guards while they were on the ground. Officer Robinson testified similarly that defendant was "engaged in active resisting" on the ground. Trainor likewise testified that defendant was "resisting the whole time" on the ground and "remained combative" despite being given orders to stop resisting. Trainor specified that defendant was "fighting" by "bucking and stuff like that off the concrete." Trainor further stated that he was unable to subdue or restrain defendant alone, so other guards helped put handcuffs and leg irons on him. Thus, three guards testified consistently that defendant resisted.

¶ 45　　　　We likewise determine the evidence was not closely balanced as to whether defendant's resistance proximately caused an injury to Trainor. Again, the State need only show that defendant's actions were a contributing cause of the injury. *Cervantes*, 408 Ill. App. 3d at 910. The State presented testimony from corrections personnel supporting a conclusion that defendant was unhappy when Lieutenant Robinson told him he was to be segregated from other

- 13 -

inmates. Defendant initiated a physical altercation with Lieutenant Robinson, which could be deemed an act of resistance. See *Baskerville*, 2012 IL 111056, ¶ 25 (stating resisting encompasses "some type of physical exertion in relation to the officer's actions"). Trainor was injured in the process of restraining defendant from further assaulting Lieutenant Robinson. The State introduced pictures confirming Trainor's testimony regarding his injuries. There was no testimony contradicting the State's evidence. Thus, the only conclusion to be drawn from the record is that defendant's conduct was a contributing cause of Trainor's injuries, if not the sole cause. We recognize that, despite the very strong evidence presented by the State supporting both charges, the jury acquitted defendant of aggravated battery in connection with the charge that he punched Lieutenant Robinson. However, after evaluating "the totality of the evidence" and conducting "a qualitative, commonsense assessment of it within the context of the case" (*Sebby*, 2017 IL 119445, ¶ 53), we conclude the evidence was not closely balanced on the charge for which defendant was convicted.

¶ 46　　　　　Accordingly, we hold that defendant is not entitled to relief pursuant to the plain-error doctrine.

¶ 47　　　　　　　　　　B. Preliminary *Krankel* Inquiry

¶ 48　　　　　The parties also dispute whether the trial court conducted an adequate preliminary inquiry regarding defendant's *pro se* allegations of ineffective assistance. This is commonly referred to as a "*Krankel*" inquiry. See *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 49　　　　　The procedure that developed from *Krankel* and its progeny encourages trial courts to address *pro se* claims of ineffective assistance fully, thereby narrowing the issues on appeal. *People v. Roddis*, 2020 IL 124352, ¶ 34. When a defendant raises an ineffective-assistance claim, the court first should examine the claim's factual basis. *Roddis*,

2020 IL 124352, ¶ 35. "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Roddis*, 2020 IL 124352, ¶ 35. "However, if the allegations show possible neglect of the case, new counsel should be appointed" to represent the defendant at a hearing on the ineffective-assistance claim. *Roddis*, 2020 IL 124352, ¶ 35.

¶ 50         A preliminary *Krankel* inquiry typically requires " 'some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation.' " *People v. Ayres*, 2017 IL 120071, ¶ 12 (quoting *People v. Jolly*, 2014 IL 117142, ¶ 30). The court may also "discuss the allegations with defendant" and rely on the court's own "knowledge of defense counsel's performance at trial." *Ayres*, 2017 IL 120071, ¶ 12. An adequate preliminary *Krankel* inquiry is an " 'inquiry sufficient to determine the factual basis of the claim.' " *Ayres*, 2017 IL 120071, ¶ 11 (quoting *People v. Banks*, 237 Ill. 2d 154, 213 (2010)).

¶ 51         "The applicable standard of review depends on whether the trial court did or did not determine the merits of the defendant's *pro se* posttrial claims of ineffective assistance of counsel." *People v. Jackson*, 2020 IL 124112, ¶ 98. Specifically, "[w]hether the trial court properly conducted a *Krankel* preliminary inquiry presents a legal question that we review *de novo*." *Jackson*, 2020 IL 124112, ¶ 98. "However, if the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous." *Jackson*, 2020 IL 124112, ¶ 98. Here, defendant challenges only the adequacy of the court's preliminary *Krankel* inquiry, so we apply the *de novo* standard of review.

¶ 52       We determine the trial court conducted an adequate preliminary inquiry regarding defendant's claims of ineffective assistance. The court allowed defendant to explain his claims, urging him to provide "as much detail as you can." The court then solicited defense counsel's response to the allegations. Finally, the court gave defendant an opportunity to reply. By following this procedure, the court received enough information to understand the factual basis of defendant's claims.

¶ 53       Nevertheless, defendant argues that the court should have conducted a further inquiry to address the dispute between defendant and his counsel as to whether Gomez's proposed testimony would have been hearsay. Specifically, defendant asserts that the court should have "ask[ed] defense counsel about what Gomez's observations actually were." We discern no error. Gomez's affidavit is not included in the record, but defense counsel said he determined that Gomez's proposed testimony would have been inadmissible. Although defendant disagreed with counsel on that point, we note that defendant also relied on an affidavit from Salgado that was obviously inadmissible hearsay. It is reasonable to presume that counsel, as a criminal defense attorney, was more familiar than defendant with the rules of evidence. Supporting that presumption is the trial court's observation that defense counsel's performance at trial was "absolutely stellar."

¶ 54       Defendant relies on *People McLaurin*, 2012 IL App (1st) 102943, where the appellate court held that there was "not enough in the record to properly evaluate" the defendant's claims of ineffective assistance. *McLaurin*, 2012 IL App (1st) 102943, ¶ 53. *McLaurin* is distinguishable. That case involved a defense attorney who failed to subpoena a potentially crucial witness, and the record did not indicate the extent of counsel's efforts to investigate that witness or secure his attendance at trial. Here, by contrast, the record shows that

defense counsel investigated defendant's claims and determined that Gomez would not offer admissible testimony.

¶ 55                              III. CONCLUSION

¶ 56          For the reasons stated, we affirm defendant's conviction for felony resisting a correctional officer.

¶ 57          Affirmed.