# Illinois Official Reports

## Appellate Court

*People v. Slaymaker*, 2015 IL App (2d) 130528

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY SLAYMAKER, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-13-0528 |
| Filed | February 3, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for resisting a peace officer was reversed on the ground that the officer was not engaged in an authorized act at the time and could not pat him down for weapons while he was in the course of a community-caretaking encounter, since the officer observed defendant walking in the paved portion of a highway median, defendant did not appear to be in distress, he said he was going to McDonalds, but when he began to put his hand in his pocket, the officer thought he was reaching for a weapon and then grabbed defendant and advised him he wanted to pat him down for weapons and ultimately tased and handcuffed him, but the innocuous act of attempting to put his hand in his pocket, standing alone, did not give rise to a reasonable suspicion of criminal activity on defendant's part or the presence of a weapon, regardless of the fact that defendant's pockets were bulging, especially when the officer was not investigating any crime or had a reasonable suspicion that defendant had a weapon. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 11-CM-3696; the Hon. John S. Lowry, Judge, presiding. |
| Judgment | Reversed. |

Counsel on Appeal

Michael J. Pelletier, Thomas A. Lilien, and Sherry R. Silvern, all of State Appellate Defender's Office, of Elgin, for appellant.

Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hutchinson and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant, Anthony Slaymaker, was found guilty of resisting a peace officer (720 ILCS 5/31-1(a) (West 2010)). He appeals, contending that he could not be convicted of resisting because the officer was not engaged in an authorized act at the time. Specifically, he argues that the officer was not authorized to pat him down for weapons in the course of a community-caretaking encounter. We agree and reverse.

¶ 2    An information charged defendant with resisting an authorized act of Officer Robert Lewis, specifically, defendant's arrest. Before trial, defendant moved to quash his arrest and suppress evidence. The matter proceeded to a simultaneous hearing on the motion and bench trial. Lewis was the only witness.

¶ 3    Lewis testified that he was a Roscoe police officer. He was on duty on August 2, 2011, driving north on Highway 251. It was very hot and starting to get dark when he saw defendant walking in the paved portion of the highway median. Lewis thought this unusual, as there was no "pedestrian access," in other words, no sidewalk or other means of access to the median. Lewis continued north on 251 looking for a disabled vehicle. Finding none, he turned around and returned to where defendant was walking. As he pulled over to the shoulder, he activated his emergency lights to alert oncoming traffic.

¶ 4    Defendant, who was talking on a cell phone, approached Lewis as he was getting out of the squad car. They met a few feet into the grassy area of the median. In response to Lewis's question, defendant said that he was going to McDonald's, which was a little farther south on Highway 251. Lewis did not ask defendant if he needed assistance. Defendant did not appear to be in medical distress; he was not panting or sweating profusely.

¶ 5     After defendant said that he was going to McDonald's, he started to put his hand in his right pocket and began to move away from Lewis, so that Lewis could not see for what he was reaching. Lewis grabbed toward defendant's hands to prevent him from retrieving what was in his pocket, and he advised him that he wanted to pat him down for weapons.

¶ 6     Lewis continued to give defendant directions but "wasn't getting much of a response." He did get defendant to walk toward the squad car. Lewis wanted to get control of defendant's hands and get him off the cell phone. Defendant started screaming into the cell phone and would not obey Lewis's orders. Lewis advised defendant that he was going to place him in handcuffs. Defendant was tensing his arm and "resisting any kind of control," so Lewis drew his Taser.

¶ 7     Defendant was still not listening to verbal commands, so Lewis again tried to gain physical control but could not. Lewis began to step away. Defendant reached toward and briefly touched the Taser, "as if he was trying to grab it or knock it away." Lewis pulled back the Taser and stepped back. Regaining control of the Taser, he stepped toward defendant and fired it. Defendant continued to move away, which suggested to Lewis that the Taser had not made a complete connection. Lewis pursued "the suspect" and made a complete connection with the Taser on defendant's leg. At that point he tackled defendant and handcuffed him.

¶ 8     The prosecutor argued in closing that the incident was not a seizure but a community-caretaking function. It was defendant who "changed the nature" of the encounter by putting his hand in his pocket and disregarding the officer's commands. Defense counsel argued that no authority exists for seizing someone during a community-caretaking function. Once defendant plausibly said that he was going to McDonald's and the officer saw no indication that defendant was in medical distress, defendant should have been allowed to go about his business.

¶ 9     The trial court took the matter under advisement and issued its findings at a later hearing. The court found that the officer engaged in a valid community-caretaking function out of concern for defendant's welfare. The community-caretaking function was a seizure, but it was objectively reasonable. Because the officer had not "completed his inquiry" when defendant responded " 'McDonald's,' " he was not free to go at that point, and his conduct in reaching into his bulging pocket and moving away from the officer justified the officer's request to pat him down for safety reasons. The court thus denied the motion to quash and suppress and found defendant guilty of resisting.

¶ 10    After denying defendant's motion to reconsider, the trial court sentenced him to conditional discharge and 180 days in jail with credit for time served. Defendant timely appeals.

¶ 11    Defendant argues that a conviction of resisting requires that the officer be engaged in an authorized act. See 720 ILCS 5/31-1 (West 2010). He further contends that the officer had no authority to physically restrain him and pat him down for weapons in the course of a community-caretaking function and that, accordingly, his conviction must be reversed. We agree.

¶ 12    Where a defendant challenges on appeal the sufficiency of the evidence, we ask whether, after viewing all the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Here, defendant was charged with resisting a peace officer, which required the State to prove that he knowingly resisted the performance by

someone he knew was a police officer "of any authorized act within his official capacity." 720 ILCS 5/31-1(a) (West 2010). The act must be one that the officer was authorized to perform. *People v. Hilgenberg*, 223 Ill. App. 3d 286, 289 (1991). Thus, if Lewis was not engaged in an authorized act when defendant resisted, defendant's conviction must be reversed.

¶ 13    We note that, although the information charged defendant with resisting his arrest, the evidence at trial showed that he resisted prior to being arrested, when Lewis attempted to pat him down for weapons. The distinction is important because, while a defendant may not resist an arrest even if it is unlawful (720 ILCS 5/7-7 (West 2010)), that statute does not apply where police are not effectuating an arrest. *City of Champaign v. Torres*, 214 Ill. 2d 234, 243 (2005); *People v. Moore*, 286 Ill. App. 3d 649, 654 (1997) (defendant fleeing from officer who did not have reasonable grounds to suspect him of crime could not be convicted of obstructing; section 7-7 did not apply).

¶ 14    The State argues that Lewis's initial contact with defendant was authorized as a community-caretaking function. Courts have recognized three theoretical tiers of police-citizen encounters. The first tier involves an arrest of a citizen, which must be supported by probable cause. *People v. McDonough*, 239 Ill. 2d 260, 268 (2010). The second tier involves a temporary investigative seizure pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). *McDonough*, 239 Ill. 2d at 268. "In a '*Terry* stop,' an officer may conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity and such suspicion amounts to more than a mere 'hunch.' " *Id.* (citing *Terry*, 392 U.S. at 27). The third tier involves consensual encounters. An encounter in this tier involves no coercion or detention and, therefore, does not implicate the fourth amendment. *Id.* (citing *People v. Luedemann*, 222 Ill. 2d 530, 544-45 (2006)).

¶ 15    In *Luedemann*, the supreme court noted that several Illinois decisions had imprecisely referred to the third tier of police-citizen encounters as the "community caretaking" function. *Luedemann*, 222 Ill. 2d at 544-45. The court instructed that the use of the label "community caretaking" to describe third-tier encounters was incorrect. Rather than describing a tier of police-citizen encounters, "community caretaking" refers to a capacity in which the police perform some task unrelated to the investigation of crime, such as helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home. "Courts use the term 'community caretaking' to uphold searches or seizures as reasonable under the fourth amendment when police are performing some function other than investigating the violation of a criminal statute." *Id.* at 546.

¶ 16    Generally, a court must find two general criteria to decide that a seizure is justified as community caretaking. First, law enforcement officers must be performing some function other than the investigation of a crime. Second, the search or seizure must be reasonable because it was undertaken to protect the safety of the general public. *McDonough*, 239 Ill. 2d at 272. " 'Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.' " *Id.* (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). "The court must balance a citizen's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement." *Id.*

¶ 17    Here, the parties agree that the initial encounter was justified as community caretaking.[1] Defendant does not appear to dispute that the encounter was initially reasonable: he was walking in the median of a busy highway on a hot evening, and it was reasonable for Lewis to inquire whether he had had car trouble and needed assistance. However, once he plausibly explained that he was walking to the nearby McDonald's, did not appear to be in medical distress, and did not request assistance, he should have been free to go about his business. See *Terry*, 392 U.S. at 19-20 (officer's conduct must be reasonably related in scope to the circumstances that justified the intrusion in the first place). The officer was simply not authorized to prolong the encounter in order to frisk defendant for a possible weapon.

¶ 18    The State, having justified the original encounter on the basis of community caretaking, then attempts to bootstrap it into a *Terry* stop without the officer having developed a reasonable suspicion that defendant either had a weapon or was engaged in criminal activity. *Terry* permits a reasonable search for weapons for the officer's protection where "he has reason to believe that he is dealing with an armed and dangerous individual." *Id.* at 27. In deciding whether the officer's conduct was reasonable under the circumstances, we consider not "his inchoate and unparticularized suspicion or 'hunch,' but *** the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* To be sure, an officer initially engaged in community caretaking may develop a reasonable suspicion that the subject of the inquiry has a weapon. That was the case in *People v. Colyar*, 2013 IL 111835, where an officer approached a car to find out why it was blocking the entrance to a parking lot. Upon approaching the car, he saw a bullet in plain view. *Id.* ¶ 8. This gave him reasonable grounds to conduct a *Terry* stop. *Id.* ¶ 13.

¶ 19    The State points to no similar circumstances here. The State makes much of the fact that defendant attempted to put his hand in his pocket. However, that innocuous act, standing alone, does not give rise to a reasonable suspicion of criminal activity or the presence of a weapon. As the First District aptly noted:

> "There is nothing criminally suspicious about walking down the street with one's hands in one's pockets, whether it was on a cold night in Chicago [citation], or, as noted by the State in this case, on a 'likely warm' morning in May, where the contextual evidence introduced by the State reasonably suggests that respondent was holding up his pants, which 'were sagging down near his–his butt' when he removed his hands in compliance with Officer Millan's directive. Putting something in one's pockets, in this case, one's hands, is not a hallmark of criminal activity. [Citation.]" *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶ 30.

See also *United States v. Carrasco*, 236 F. Supp. 2d 1283, 1289 (D.N.M. 2002) (pat-down search of passenger of vehicle stopped for traffic violation was unreasonable where defendant made no movements that would have aroused reasonable suspicion that he was armed and dangerous; search was not justified merely because defendant kept his hands in his pockets).

¶ 20    The State also emphasizes that defendant's pockets were "bulging." However, that bulging likewise did not give Lewis a reasonable suspicion that defendant had a weapon. See *People v. Surles*, 2011 IL App (1st) 100068, ¶ 40. Further, as neither the bulging nor

---

[1]Neither party asserts that the initial encounter was consensual and thus required no justification. Accordingly, we do not consider any such possibility.

defendant's attempt to put his hand in his pocket was suspicious, "we must also conclude that these two together are also insufficient, because '[w]hen you add nothing to nothing, you get nothing.' (Internal quotation marks omitted.)" *Id.* ¶ 41 (quoting *People v. Lee*, 214 Ill. 2d 476, 486 (2005)).

¶ 21    The State cites no case holding that a frisk for weapons is appropriate in the course of a community-caretaking encounter. Instead, the State relies solely on *Terry*-stop cases. It concedes this much, but argues without much elaboration that those cases should govern here anyway. The obvious distinction between those cases and this one is that in the former the officers reasonably suspected criminal activity.

¶ 22    In *McDonough*, for example, an officer approached a car stopped on the side of the road. Upon approaching the car, he detected a strong odor of alcohol, which gave him a reasonable suspicion to investigate the driver for driving under the influence. *McDonough*, 239 Ill. 2d at 274. In *Colyar*, as mentioned above, officers approached a car to see why it was blocking the entrance to a motel. Upon their approach, they saw a bullet in plain view, which gave them a reasonable suspicion that the car's occupants might have had a weapon. *Colyar*, 2013 IL 111835, ¶¶ 42-43. The State does not explain why these cases should control in a situation where the encounter was undertaken solely for defendant's benefit and the officer never articulated any valid basis to believe that defendant was involved in criminal activity or had a weapon. It would be odd indeed if an encounter that by definition is divorced from the investigation of crime should give the officer greater authority to search the subject of the encounter for weapons than would an encounter in which the officer reasonably suspects the subject of criminal activity.

¶ 23    The State, citing Justice Thomas's concurring opinion in *Colyar*, argues that concerns for officer safety justified the frisk here. Justice Thomas was primarily responding to the dissent's contentions that the presence of the bullet did not give the police reasonable grounds to suspect the defendant of a crime and that, in the absence of a reasonable suspicion of criminal activity, a protective frisk is never permissible. Justice Thomas argued that a protective frisk is reasonable where the police have a reasonable suspicion that a person is armed although they do not otherwise suspect him of criminal activity. *Colyar*, 2013 IL 111835, ¶ 74 (Thomas, J., specially concurring). Justice Thomas did not suggest that police should be able to frisk for weapons when they lack a reasonable suspicion that a person is armed.

¶ 24    The judgment of the circuit court of Winnebago County is reversed.

¶ 25    Reversed.