NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220544-U

NO. 4-22-0544

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 23, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Winnebago County |
| TYRICE L. MORGAN, | ) | No. 20CF1197 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randy Wilt, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justice Harris concurred in the judgment.
Justice Turner specially concurred.

**ORDER**

¶ 1   *Held:* The appellate court affirmed defendant's convictions of resisting a peace officer with injury where the injuries were proximately caused by defendant's acts and the statute did not require great bodily harm.

¶ 2   Defendant, Tyrice L. Morgan, appeals his convictions on two counts of resisting a peace officer causing injury (720 ILCS 5/31-1(a-7) (West 2020)) following a bench trial. Defendant argues that (1) the State failed to show his detention by the police was an authorized act, (2) defendant's resisting was not the proximate cause of the officers' injuries, and (3) the officers' injuries were too *de minimis* to sustain the guilty verdicts. For the following reasons, we affirm.

¶ 3   I. BACKGROUND

¶ 4        A Winnebago County grand jury indicted defendant for the following offenses: being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2020)) (count I), unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)) (count II), resisting a peace officer causing injury (counts III-V), and possession of a controlled substance (720 ILCS 570/402(c) (West 2020)) (count VI). Counts III and IV charged two different injuries sustained by the same police officer. The State dismissed count VI before trial. Following trial, the trial court acquitted defendant on counts I and II but convicted him on counts III, IV, and V. These charges arose from defendant's attendance at a party in Rockford in the early morning hours of June 19, 2020. Two Rockford police officers, Michael Edwards and Kaera Watson, were injured during a foot pursuit after defendant fled from the officers while they attempted to handcuff him. Defendant's trial consisted of the following evidence. We include only those facts pertinent to this appeal.

¶ 5                              A. The State's Case

¶ 6                              1. *Officer Michael Edwards*

¶ 7        Officer Michael Edwards testified on direct examination as follows. In June 2020, Edwards was assigned to the Specialized Community Oriented Police Enforcement Team (SCOPE), focusing on "high crime" areas of the city. At 1 a.m. on June 19, 2020, Edwards responded to a sergeant's request for additional units at 1416 Fourth Avenue, where a "large" party was in progress. After Edwards arrived at that location, someone said there was a "gun." Edwards did not recall whether he was told where the gun was found. Edwards saw Officers Jhordynne Alexander and Kaera Watson speaking with defendant. According to Edwards, Alexander and Watson were trying to place defendant's hands behind his back. Edwards assisted those officers in attempting to "secure" defendant by "grabbing hold" of him. According to Edwards, defendant

"took off running" through neighboring yards. Edwards gave pursuit, but he fell in a driveway and scraped his forearm. His arm was bleeding. During the pursuit, Edwards also scraped his knees. According to Edwards, he might have injured his knees when he fell in the driveway, but his knees could have been injured elsewhere during the pursuit. Edwards testified that after he fell in the driveway, he continued to pursue defendant as defendant leapt over a chain-link fence and attempted to climb over a wooden fence. Defendant knocked down the wooden fence when he attempted to climb over it and fell to the ground. According to Edwards, he tried to handcuff defendant, but defendant kept his body tense and his hands beneath him on the ground. Edwards testified that other officers were also "trying to take [defendant] into custody." According to Edwards, the officers eventually handcuffed defendant.

¶ 8          On cross-examination, Edwards testified as follows. Upon being dispatched to the scene, Edwards was not advised that anyone had committed any crimes. Edwards had no information about the gun that was found. Edwards testified that he did not see defendant violate any laws. Edwards said he had no information that defendant was a suspect in any crimes. When defense counsel asked Edwards if he knew why Watson and Alexander were trying to put defendant's hands behind his back, Edwards responded: "I can't answer that." Then the following exchange occurred:

"[DEFENSE COUNSEL]: Did [Watson and Alexander] tell you that [defendant] had committed any crime prior to them putting their [sic] hands behind his back?

[EDWARDS]: No. ***

[DEFENSE COUNSEL]: Well, did anybody say anything to [defendant] as to why they were handcuffing him?

[EDWARDS]: No."

¶ 9        Edwards testified that Watson and Alexander both unsuccessfully tried a "leg sweep," which was a maneuver designed to fell defendant to the ground. According to Edwards, defendant "broke away" and started running. According to Edwards, he never saw defendant in possession of a gun throughout the pursuit and he never saw defendant throw anything, even though (1) he was the officer who was closest behind defendant during the pursuit, and (2) defendant lost his pants when he hopped over the chain link fence. Edwards testified that after defendant finally was handcuffed, officers found marijuana and suspected narcotics on his person.

¶ 10                    2. *Officer Kaera Watson*

¶ 11        On direct examination, Officer Kaera Watson testified as follows. On June 19, 2020, Watson, who was also a member of the SCOPE unit, was dispatched to 1416 Fourth Avenue because patrol officers had been sent there for a "loud party," and "additional officers were requested on scene." She observed about 30 people standing around with their hands raised in the air. Watson heard a police sergeant say a gun was found underneath or near one of the vehicles in the driveway. Watson saw Alexander trying to "detain" defendant, so she assisted her. They were unable to handcuff defendant because he was pulling away, and then he ran. According to Watson, defendant was holding his waistband as he ran. Watson pursued him over a chain-link fence into a neighbor's yard. According to Watson, she saw defendant fling his left hand out and hit a tree branch. Then, she testified, she heard "something either hit or fall" where defendant had flung out his hand. Watson testified she did not see anything in defendant's left hand. She just heard "something" fall or make contact on the other side of a fence that was there. Watson testified she was injured when pursuing defendant over a wooden fence. Watson testified that a nail in the fence punctured the palm of her hand. Watson also described another puncture wound to her shin and an

elbow scrape. According to Watson, the wooden fence collapsed, sending defendant to the ground. Watson testified that defendant was "pulling his hands underneath his body," so she forced his right hand behind his back because "he still wasn't complying" with being handcuffed. Watson testified that, eventually, she and other officers handcuffed defendant.

¶ 12　　　　On cross-examination, Watson testified as follows. A sergeant on the scene ordered the crowd to raise their hands after the gun was found by a car, but the sergeant was not patting anyone down for weapons. When Watson first saw defendant, he was on the porch of the residence. Defense counsel asked Watson: "Do you know why [Alexander] was attempting to handcuff [defendant]?" Watson answered: "No, I do not."

¶ 13　　　　　　　　　　　3. *Officer Bryce Davis*

¶ 14　　　　On direct examination, Officer Bryce Davis testified as follows. On June 19, 2020, Davis, who was another member of the SCOPE unit, and his partner "just showed up" at 1416 Fourth Avenue "to assist" other officers who were there "for a call." Davis did not say what time he arrived at that location, but he testified that when he got there, he was advised that "someone was running from the house." Davis and his partner then drove around looking for the subject. When Davis saw defendant, he was already in custody. According to Davis, Watson directed him to a location near a wooden fence, where Watson said defendant had thrown "something." Davis found a loaded handgun and a magazine with live ammunition.

¶ 15　　　　On cross-examination, Davis testified that there were a "fair amount" of people at the Fourth Avenue address when he arrived there, but none of them were handcuffed.

¶ 16　　　　After the parties stipulated that the handgun Davis found was a "firearm," the State rested. The trial court denied defendant's motion for a directed finding of not guilty.

¶ 17　　　　　　　　　　　B. The Defense Case

¶ 18 Lovely McBride was defendant's sole witness. She testified as follows. At 1 a.m. on June 19, 2020, she was with a group of girls on a sidewalk west of the residence at 1416 Fourth Avenue. There were 30 or 40 people there, drinking. McBride testified it was like a "block party." According to McBride, defendant was in front of the house. When the police cars pulled up flashing their lights, McBride saw 10 or 15 people, including defendant, run toward the backyard.

¶ 19 C. The Court's Ruling and Sentence

¶ 20 The trial court found defendant not guilty of being an armed habitual criminal and unlawful possession of a weapon by a felon (counts I and II). The court found inconsistencies in the accounts of Edwards and Watson. Specifically, the court noted that Edwards was closest to defendant and did not see him with a gun (Edwards said defendant lost his pants during the pursuit, and Edwards did not see a gun on defendant's person when that happened) or see him throw anything. The court also found that no physical evidence linked defendant to the gun Davis found by the fence.

¶ 21 Regarding the State's evidence relating to resisting a peace officer, the trial court stated:

"There are certain gaps, questions that have never been answered. We start with: why did the officers even decide they had the right to approach [defendant] and detain him? But there's not a motion to suppress physical evidence or to quash any type of arrest ***, so presumably, [the police] had a basis to do that.

Even if they didn't, the moment [defendant] resisted them, then that became a crime in and of itself, and at that point in time [the police] had the right to arrest him for resisting a peace officer."

¶ 22 At sentencing, the trial court stated:

"I still am not sure why the officers, on that particular day, targeted [defendant] when there was a crowd of a number of people outside. *** I still don't know why they targeted [defendant], and the evidence shows he was standing up by a porch. *** There's no indication what he was doing, but he ran."

The court merged the convictions on counts III and IV (both pertaining to Watson) and sentenced defendant to 30 months' probation on each conviction, to be served concurrently, 180 days in the county jail, and a $1000 fine.

¶ 23        This appeal followed.

¶ 24                                 II. ANALYSIS

¶ 25        Defendant argues that his convictions for resisting a peace officer causing injury must be reversed because the State failed to prove (1) the police performed an authorized act in detaining defendant, (2) the officers' injuries were proximately caused by defendant's alleged resisting, and (3) the officers suffered great bodily harm. A person commits the offense of resisting a peace officer when he or she knowingly resists or obstructs the performance by one known to the person to be a peace officer. 720 ILCS 5/31-1(a) (West 2020). To establish the offense, the State must prove the following elements: (1) the defendant knowingly obstructed a peace officer, (2) the peace officer was performing an authorized act in his or her official capacity, and (3) the defendant knew the officer was a peace officer. *People v. Baskerville*, 2012 IL 111056, ¶ 32. A person who is convicted of resisting a peace officer and whose resistance was the proximate cause of "injury" to the officer commits a Class 4 felony. 720 ILCS 5/31-1(a-7) (West 2020).

¶ 26        In reviewing the sufficiency of the evidence, our inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Baskerville*, 2012 IL 111056, ¶ 31.

¶ 27                                  A. Performance of an Authorized Act

¶ 28          Counts III, IV, and V of the indictment alleged that Edwards's and Watson's "authorized act" was the "detainment" of defendant. The evidence showed defendant was detained twice: first, when those officers assisted Alexander in attempting to handcuff defendant on the porch and, second, after the foot pursuit when the police handcuffed defendant on the ground. The fourth amendment to the United States Constitution and the Illinois Constitution (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6) protect people against unreasonable searches and seizures. *People v. Trull*, 64 Ill. App. 3d 385, 388 (1978). There are three tiers of warrantless police-citizen encounters that do not violate the fourth amendment: (1) an arrest supported by probable cause, (2) a temporary investigative seizure (*Terry* stop) pursuant to *Terry v. Ohio* , 392 U.S. 1 (1968), and (3) consensual encounters. *People v. Gherna*, 203 Ill. 2d 165, 176-77 (2003). At trial, the State proffered no evidence or argument as to the reason for Alexander's detention of defendant on the porch. The State did not call Alexander as a witness. Rather, the State argued that defendant's acts of pulling away from the officers and running constituted resisting a peace officer.

¶ 29          On appeal, the State posits that two distinct episodes justified detaining defendant: (1) the officers' initial response to a loud party and (2) Watson's reasonable suspicion that defendant threw a gun away during the foot pursuit. The State maintains that each episode is subject to a separate fourth amendment analysis. By contrast, defendant argues that there was one continuing episode beginning with his illegal detention on the porch and ending with his being handcuffed after the foot pursuit. Defendant maintains that his illegal seizure on the porch tainted everything that happened after that.

¶ 30                    1. *The Loud Party as a Reason to Detain Defendant*

¶ 31            Watson testified that the police responded to a "loud party" at 1 a.m. The State infers from this that the police had the right to detain everyone present for violation of local noise ordinances. However, the State presented no evidence of any excessive noise constituting a violation of any specific ordinance as, for instance, existed in *Town of Normal v. Stelzel*, 109 Ill. App. 3d 836 (1982). In *Stelzel*, the prosecution proved the defendant was operating a sound amplifying device in a manner prohibited by a Town of Normal ordinance and others were playing music that was being sent out through the device. *Stelzel*, 109 Ill. App. 3d at 837. Even the sound of drums was amplified. *Stelzel*, 109 Ill. App. 3d at 839. Neighbors testified that they were "annoyed" by the loud music. *Stelzel*, 109 Ill. App. 3d at 839. Here, even if we apply the principle that "all persons participating in the breach of a municipal ordinance are guilty as principals" (internal quotation marks omitted) (*Stelzel*, 109 Ill. App. 3d at 838)), there was no evidence that defendant was making noise. Edwards observed defendant speaking with Alexander and Watson on the porch. Watson first observed defendant when Alexander was trying to pull his hands behind his back. Watson did not know why Alexander was detaining defendant.

¶ 32            Watson testified that the police found a gun under or near a vehicle in the driveway, but the State does not argue that incident justified defendant's detention on the porch. Indeed, the State cannot justify defendant's detention based on this gun. There was no evidence that defendant either knew about the gun or that the gun was in an area under his immediate and exclusive control. See *People v. Anderson*, 2018 IL App (4th) 160037, ¶ 29 (stating constructive possession of a gun consists of proof the defendant knew of the gun, and it was in his immediate and exclusive control). In *People v. Sams*, 2013 IL App (1st) 121431, ¶ 13, evidence that the defendant walked out of a house where a gun was later found by the police was insufficient to establish constructive

possession. "[M]ere proximity" to a gun is also insufficient to prove actual possession. *Anderson*, 2018 IL App (4th) 160037, ¶ 31. Here, there was no evidence of the distance between where the gun was found in the driveway and where defendant was standing on the porch. Nor did the State show when defendant was detained in relation to when the gun was found. Similarly, no evidence connected defendant to the vehicle near which the gun was found.

¶ 33    The trial court noted the "gap" in evidence, meaning the lack of any proof as to the reason for detaining defendant on the porch. Nevertheless, the court stated that "presumably" the police had the right to detain the defendant because he did not move to suppress evidence or quash his arrest. As the appellate court noted in another context, "[t]he presumption of innocence guarantees that the accused has no obligation to come forward with any evidence concerning the proof, or lack thereof, of any of the elements of the charged offense." *People v. Purcell*, 325 Ill. App. 3d 551, 557 (2001). We add that "[i]t is a firmly settled proposition of law that the burden of proof never shifts to the defendant no matter what his defense may be." *People v. Williams*, 28 Ill. App. 3d 67, 70 (1975). We also caution that the State cannot "leave to conjecture or assumption essential elements of the crime." *People v. Laubscher*, 183 Ill. 2d 330, 336 (1998). Thus, due to the trial court's unfortunate choice of words, it appears as though the court might have exercised a presumption against defendant and shifted the burden of proof. Nevertheless, as we shall see, the court based its guilty verdicts on the evidence of defendant's flight rather than impermissible assumptions.

¶ 34    Defendant contends that the lack of evidence as to why the police were attempting to handcuff him on the porch constituted a lack of evidence that the police were performing an authorized act. Defendant relies on *People v. Gallagher*, 2020 IL App (1st) 150354, and *People v. Jones*, 2015 IL App (2d) 130387.

¶ 35        In *Gallagher*, the court broadly stated that "[i]f the officer's conduct violated the fourth amendment, it is unauthorized, and the defendant, therefore, is not in violation of [the resisting statute]." *Gallagher*, 2020 IL App (1st) 150354, ¶ 29. In opining thusly, the court relied on *Jones*. *Gallagher*, 2020 IL App (1st) 150354, ¶ 29. However, the First District misread *Jones* on this point. In *Jones*, the Second District acknowledged that where the authorized act is an *arrest*, the inquiry ends, because a defendant is not privileged to resist even an unlawful arrest. *Jones*, 2015 IL App (2d) 130387, ¶ 11. Indeed, our supreme court in *City of Champaign v. Torres*, 214 Ill. 2d 234, 242 (2005), said that an arrest made by a peace officer is an " 'authorized act' even if the arrest is unlawful," quoting *People v. Locken*, 59 Ill. 2d 459, 465 (1974). However, where a peace officer is not undertaking an *arrest*, the *Locken* rule is inapplicable. *Torres*, 214 Ill. 2d at 243-44. Thus, in *Gallagher*, the court held that the defendant was not guilty of resisting a peace officer where the officer lacked a reasonable, articulable suspicion warranting a *Terry* stop. *Gallagher*, 2020 IL App (1st) 150354, ¶ 42.

¶ 36        At trial, the State argued that the officers' attempt to handcuff defendant on the porch was an arrest. On appeal, however, in arguing that the loud party gave the officers reasonable grounds to "detain" defendant, the State argues that the police effectuated a *Terry* stop. In *Terry*, the Supreme Court of the United States provided an exception to the warrant and probable cause requirements by allowing an officer to conduct a brief, investigatory stop of a person the officer believes has committed, or is about to commit, a crime. *People v. Timmsen*, 2016 IL 118181, ¶ 9; *People v. Walker*, 2013 IL App (4th) 120118, ¶ 33. A *Terry* stop must be justified at its inception, and the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. *People v. Colyar*, 2013 IL 111835, ¶ 40. A "reasonable suspicion" is "considerably" less than that necessary for probable

cause. *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 41. Handcuffing a defendant does not *de facto* convert a *Terry* stop into an arrest. *Colyar*, 2013 IL 111835, ¶ 46. For instance, handcuffing during a *Terry* stop was proper where the officers were outnumbered at dusk and they reasonably suspected that one or more of the persons detained in a car had access to a gun. *People v. Richardson*, 2017 IL App (1st) 130203-B, ¶ 29. Here, it was 1 a.m. in a high crime area where 30 or 40 people were milling about and a gun had been found. Under these circumstances, Alexander's attempt to handcuff defendant, joined by Watson and Edwards, could have occurred during a *Terry* stop.

¶ 37        Importantly, the indictment charged that the officers' authorized act was the "detainment" of defendant, rather than his arrest. "Detention" connotes the lower standard of reasonable suspicion, rather than the more exacting standard of probable cause. *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 65. Generally, when we speak of the police's right to detain an individual, we speak of whether the officer has "reasonable suspicion"—as opposed to probable cause—to justify the detention. See *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 79 (stating detention must be supported by reasonable suspicion). Due process limits us to the conduct alleged in the indictment. *People v. Wrencher*, 2015 IL App (4th) 130522, ¶ 35. Thus, we agree that the attempt to handcuff defendant on the porch was a *Terry* stop rather than an arrest. We also agree with defendant that the State presented no evidence justifying the *Terry* stop. However, that does not end our inquiry, because the State argues that Watson later reasonably suspected that defendant discarded a gun during the foot pursuit, justifying defendant's detention after the pursuit ended.

¶ 38        2. *The Police Pursuit and Detention of Defendant*

¶ 39        The facts are not in dispute. Defendant ran away from the officers during their attempt to handcuff him on the porch. Edwards, Watson, and other officers pursued defendant on

foot. Watson testified that defendant was holding his waistband as he ran and then threw an object during the chase. Davis recovered a gun and a magazine from the location where defendant threw the object. After defendant broke a wooden fence and fell to the ground, the officers eventually handcuffed him.

¶ 40                              a. Defendant's Flight as Probable Cause

¶ 41        The first issue is whether defendant's flight gave the police probable cause to arrest him for resisting a peace officer. The trial court found that even if detaining defendant on the porch was unlawful, when defendant ran from the police, he committed the crime of resisting a peace officer.

¶ 42        When an officer approaches a person without reasonable suspicion or probable cause, that person can "ignore the police and go about his business." (Internal quotation marks omitted.) *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 29. A mere refusal to cooperate, without more, does not justify detention or seizure. *Eyler*, 2019 IL App (4th) 170064, ¶ 29.

¶ 43        However, in *Eyler*, 2019 IL App (4th) 170064, ¶ 29, we noted the distinction between a person's right to ignore a police officer's unreasonable intrusion and "unprovoked flight," (internal quotation marks omitted) which excites a reasonable suspicion of wrongdoing. The State relies on *People v. Thomas*, 198 Ill. 2d 103 (2001). In *Thomas*, our supreme court held that the defendant's fleeing on a bicycle when an officer unlawfully attempted to stop him for a "field interview" converted the officer's unfounded suspicion into one that justified detaining the defendant. *Thomas*, 198 Ill. 2d at 106-13. Importantly, in *Thomas*, there was no unlawful detention before the defendant fled. *Thomas*, 198 Ill. 2d at 113. Although the officer blocked the defendant's forward movement with his squad car, the defendant zigzagged onto another route to avoid the confrontation. *Thomas*, 198 Ill. 2d at 106.

¶ 44 Conversely, when a defendant flees from an unlawful *Terry* stop, the basis for the stop must exist prior thereto and cannot arise after the fact. *People v. Estrada*, 394 Ill. App. 3d 611, 619 (2009). This is so because the officer's actions are not "justified at the inception" and the person running away is not resisting or obstructing an authorized act of the peace officer. (Internal quotation marks omitted.) *People v. Moore*, 286 Ill. App. 3d 649, 654 (1997).

¶ 45 Defendant relies on *People v. Shipp*, 2015 IL App (2d) 130587, which was an appeal from the summary dismissal of a postconviction petition. In *Shipp*, the police suspected the defendant was involved in a fight. *Shipp*, 2015 IL App (2d) 130587, ¶ 6. When the officer saw the defendant, he was doing nothing unusual and did not appear to have been fighting. *Shipp*, 2015 IL App (2d) 130587, ¶ 5. The officer effectuated a *Terry* stop when he exited his squad car, ordered the defendant to stop, and then prevented the defendant from going on his way. *Shipp*, 2015 IL App (2d) 130587, ¶ 31. The defendant refused the officer's request to perform a pat down search. *Shipp*, 2015 IL App (2d) 130587, ¶ 11. The officer and his partner then grabbed the defendant's arm, but the defendant fled. *Shipp*, 2015 IL App (2d) 130587, ¶ 11. The officers chased the defendant and eventually caught and handcuffed him. *Shipp*, 2015 IL App (2d) 130587, ¶ 11. A search of the defendant's person yielded cocaine, cannabis, and cash. *Shipp*, 2015 IL App (2d) 130587, ¶ 11. The *Shipp* court held that the defendant stated the gist of a constitutional claim because he "lawfully" fled from an illegal *Terry* stop. *Shipp*, 2015 IL App (2d) 130587, ¶ 62.

¶ 46 Defendant also relies on *People v. Slaymaker*, 2015 IL App (2d) 130528. In *Slaymaker*, the court reversed the defendant's conviction of resisting a peace officer where the officer was not justified in frisking the defendant as part of his community caretaking function. *Slaymaker*, 2015 IL App (2d) 130528, ¶ 21.

¶ 47    Our case is more like *Shipp* than *Thomas*. In *Thomas*, the defendant fled—unprovoked—at the sight of the police before a stop occurred. *Thomas*, 198 Ill. 2d at 112. Here, the unlawful *Terry* stop occurred before defendant ran. A seizure occurs when an officer restrains a person's liberty, making the person believe he is not free to leave. *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 26. Alexander restrained defendant's liberty by attempting to pull his hands behind his back. Defendant's liberty was further restrained when Edwards grabbed one of his arms and then Watson and Alexander attempted to bring defendant to the ground with a leg sweep. Consequently, we determine that defendant's flight was from an unlawful *Terry* stop and did not give the officers probable cause to arrest him for the offense of resisting a peace officer.

¶ 48    b. Defendant's Act of Throwing Away a Gun as Reasonable Suspicion

¶ 49    The next issue is whether defendant's throwing away a gun during the foot pursuit gave the officers reasonable suspicion—new grounds—to detain defendant. For purposes of this discussion, defendant does not dispute that he threw away the gun and magazine Davis recovered from the fence area. Rather, defendant argues, without citing authority, that the officers were pursuing him without lawful authority and that his detention after breaking down the fence was the tainted fruit of the unlawful *Terry* stop on the porch.

¶ 50    Under the "tainted fruit" doctrine, a fourth amendment violation is the "poisonous tree," and any evidence found by exploiting that violation is the "fruit of the poisonous tree." (Internal quotation marks omitted.) *People v. Henderson*, 2013 IL 114040, ¶ 33. In *People v. Brownlee*, 186 Ill. 2d 501, 519 (1999), our supreme court noted that the tainted fruit doctrine applies to *Terry* situations. However, the example the court gave was that where an officer's *confinement* of a person goes beyond the limited restraint of a *Terry* stop, a subsequent consent to search may be tainted by the illegal confinement. *Brownlee*, 186 Ill. 2d at 519.

¶ 51 Here, the tainted fruit doctrine does not apply because defendant's flight ended the unlawful seizure. See *Henderson*, 2013 IL 114040, ¶ 37 (holding that the defendant's flight from an illegal traffic stop ended his seizure, and anything happening after that was no longer tied to the initial stop.) Although the issue in *Henderson* was whether the defendant's trial counsel was ineffective for failing to file a motion to suppress evidence, resolution of that issue depended in part on whether the gun the defendant discarded after he fled was the fruit of an illegal seizure. *Henderson*, 2013 IL 114040, ¶ 16. In holding that the gun was not the fruit of an illegal seizure, the court reasoned that the defendant's flight "interrupted the chain of causation between the illegal seizure and the discovery of the gun." *Henderson*, 2013 IL 114040, ¶ 47.

¶ 52 Our decision in *People v. Keys*, 375 Ill. App. 3d 459 (2007), is also instructive on the issue of whether defendant's flight broke any causal connection between the illegal *Terry* stop on the porch and his eventual detention after he fell through the wooden fence. In *Keys*, the defendant appealed an order denying his motion to suppress heroin, the recovery of which the defendant contended was the fruit of his illegal seizure. *Keys*, 375 Ill. App. 3d at 460. In *Keys*, the defendant "broke free and ran" from an officer during an arguably unlawful seizure. *Keys*, 375 Ill. App. 3d at 461, 464. During an ensuing chase, the officer lost sight of the defendant briefly before apprehending him. *Keys*, 375 Ill. App. 3d at 461. When the officer went back and looked in the area where he lost sight of the defendant, he found three bags of heroin. *Keys*, 375 Ill. App. 3d 461. We held that the drugs were admissible in evidence because they were not found during the initial, unlawful seizure of the defendant, but were found because the defendant abandoned them after "ending the initial seizure by escaping from the police." *Keys*, 375 Ill. App. 3d at 464. In so holding, we adopted the reasoning of the Supreme Court of the United States in *California v. Hodari D.*, 499 U.S. 621, 625 (1991), where the court stated that "[a] seizure is a single act, and

- 16 -

not a continuous fact." (Internal quotation marks omitted.) *Keys*, 375 Ill. App. 3d at 462. The Supreme Court opined that where a defendant breaks away and then discards contraband, it would "hardly be realistic" to say that the contraband was discovered during the course of the seizure. *Hodari D.*, 499 U.S. at 625. In other words, the Supreme Court expressed that there is not a "continuing arrest during the period of fugitivity." (Emphasis omitted.) *Hodari D.*, 499 U.S. at 625. Consequently, we hold that the police in our case did not extend the unlawful seizure by pursuing defendant.

¶ 53    The State argues that the officers gained a reasonable suspicion that defendant threw away a gun during the foot pursuit, which justified defendant's detention after the pursuit ended. We agree. In *People v. Bynum*, 257 Ill. App. 3d 502, 508 (1994), the trial court held that the police had a reasonable suspicion where the defendant, upon seeing the police, threw a bag into a flower bed and attempted to leave the scene. Here, Watson testified she saw defendant holding his waistband during his flight, and then she saw him fling out his arm. Watson said she heard something either fall or make contact on the other side of a fence where defendant had flung out his arm. The evidence showed that this was a high crime area where one gun had already been found. Accordingly, we hold that the detention of defendant at the end of the pursuit was an authorized act for purposes of the resisting statute.

¶ 54                    B. Proximate Cause of the Officers' Injuries

¶ 55    Defendant contends that even if we hold that he resisted an authorized act of the officers, his resisting was not the proximate cause of the officers' injuries. Defendant was charged with felony resisting the performance of Edwards and Watson pursuant to section 31-1(a-7) of the Criminal Code of 2012 (720 ILCS 5/31-1(a-7) (West 2020)). To sustain a conviction under section 31-1(a-7), the State must prove beyond a reasonable doubt that the defendant knowingly resisted

or obstructed a peace officer in the performance of an authorized act and his or her violation "proximately caused" an "injury" to the officer. *People v. Jenkins*, 2016 IL App (1st) 133656, ¶ 27. For purposes of the felony resisting statute, "proximate cause" means: "a cause which, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last nor nearest cause. It is sufficient if it combines with another cause resulting in the injury." (Internal quotation marks omitted.) *People v. Wilson*, 404 Ill. App. 3d 244, 248 (2010) (holding that the definition of proximate cause found in Illinois Pattern Jury Instructions, Civil, No. 15.01 (Supp. 2009) applies to the felony resisting statute.) In *Wilson*, the court held that the meaning of "proximate cause" is the same whether one "speaks of 'the' proximate cause or 'a' proximate cause." *Wilson*, 404 Ill. App. 3d at 249. The court thus declined to limit "proximate cause" to meaning "sole" proximate cause. *Wilson*, 404 Ill. App. 3d at 250.

¶ 56        In *Wilson*, the court also applied the analysis of proximate cause found in civil cases to the felony resisting statute. *Wilson*, 404 Ill. App. 3d at 249-50. The term "proximate cause" describes two distinct requirements: (1) cause in fact and (2) legal cause. *Wilson*, 404 Ill. App. 3d at 249. "Legal cause" is "essentially a question of foreseeability." (Internal quotation marks omitted.) *Wilson*, 404 Ill. App. 3d at 249. The relevant inquiry is "whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." (Internal quotation marks omitted.) *Wilson*, 404 Ill. App. 3d at 249.

¶ 57                                1. *Cause-in-Fact*

¶ 58        Defendant concedes that his violation was the cause-in-fact of the officers' injuries. However, his concession is based on his assumption that the resisting occurred when he fled from the officers on the porch. As discussed, the resisting occurred after defendant fell through the wooden fence and struggled against being handcuffed. Nonetheless, we hold that defendant's

conduct was the cause-in-fact of the officers' injuries. In considering cause-in-fact, courts use either the "but for" test or the "substantial factor" test. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23. Under the "substantial factor" test, a defendant's conduct is the cause of an event if it was a "material element and a substantial factor" in bringing about the event. (Internal quotation marks omitted.) *Turcios*, 2015 IL 117962, ¶ 23. Here, Watson testified that defendant was "holding his waistband initially" when the officers began their pursuit, which lasted only long enough for defendant to hop over a chain link fence and crash through the wooden fence. Watson testified that the pursuing officers then "all kind of fell through" the wooden fence. During the pursuit, Edwards and Watson were injured. We believe that defendant's resisting was in tandem with the pursuit, such that the resisting was a material element and a substantial factor in causing the injuries.

¶ 59                                    2. *Legal Cause*

¶ 60           Defendant maintains that his resisting was not the legal cause of the officers' injuries. Specifically, defendant argues that if he had foreseen the wooden fence collapsing, which caused injury to Watson, he would not have attempted to scale it. "Legal cause" is "essentially a question of foreseeability." (Internal quotation marks omitted.) *People v. Cervantes*, 408 Ill. App. 3d 906, 909 (2011). In *Cervantes*, the court noted, citing *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257-58 (1999), that the analogies between criminal and civil cases in which persons are injured or killed is so close that the principle of proximate cause applies to both kinds of cases. *Cervantes*, 408 Ill. App. 3d at 909.

¶ 61           There can be more than one legal proximate cause of a plaintiff's injuries. *Rivera v. Garcia*, 401 Ill. App. 3d 602, 611 (2010). We reject defendant's argument for two reasons: (1) when defendant ran from the officers holding his waistband, it was reasonably foreseeable that they would pursue, given that they were in a high crime area and a gun had already been discovered

(see *Cervantes*, 408 Ill. App. 3d at 909 (stating it was reasonably foreseeable that pursuing officers would chase the defendant on foot when he chose to run from them)) and (2) even if the driveway where Edwards fell was slippery due to some condition unrelated to the pursuit, or the wooden fence was too poorly constructed to hold defendant's weight, defendant should have foreseen that the officers could be injured by falling. See *Cervantes*, 408 Ill. App. 3d at 909 (stating that the defendant should have foreseen a pursuing officer might be injured by falling while climbing a fence during a pursuit.)

¶ 62        In *Cervantes*, the court held that the State need not prove that the defendant's acts were the "sole and immediate" cause of injury, but it need show only that the defendant's acts contributed to the injury. *Cervantes*, 408 Ill. App. 3d at 910. In so holding, the court analogized the proximate-cause requirement of the felony resisting statute to that required to prove felony murder. *Cervantes*, 408 Ill. App. 3d at 910. In the felony-murder context, the State must show that the death did not result from a source "unconnected with or independent of" the defendant's acts. *People v. Jones*, 376 Ill. App. 3d 372, 387 (2007). Unless there was a supervening cause, a contributing cause of a victim's death is presumed also to be a legal cause of death. *People v. Nelson*, 2020 IL App (1st) 151960, ¶ 62. Thus, in *People v. Sanchez*, 2022 IL App (4th) 210429-U, ¶ 45, we held that the defendant's act of resisting after being taken to the ground contributed to one of the officers' injuries, despite the lack of evidence of when during the struggle to take the defendant to the ground the injuries were inflicted. We adopt the reasoning we employed in *Sanchez*, 2022 IL App (4th) 210429-U, ¶ 45, where we held that the officer was injured during the "process" of restraining the defendant. Here, because the pursuit and the struggle to handcuff defendant on the ground occurred in tandem, the pursuit, during which the officers were injured, was part of the process of restraining defendant.

¶ 63        Defendant relies on *People v. Hudson*, 222 Ill. 2d 392 (2006). However, that case involved the sufficiency of the jury instruction on proximate cause. *Hudson*, 222 Ill. 2d at 395. Contrary to defendant's assertion, it is not necessary that defendant should have foreseen the precise injury resulting from his act. *Ney v. Yellow Cab Co.*, 2 Ill. 2d 74, 79 (1954). Nor is it necessary to expect the exact method by which the injury occurred. *Blue v. St. Clair Country Club*, 7 Ill. 2d 359, 364 (1955). Here, defendant chose to flee through yards at 1 a.m. in a residential neighborhood. Consequently, we determine that it was foreseeable to a reasonable person that the pursuing officers would encounter obstructions, such as driveways and fences, that could cause falls and injuries.

¶ 64                    C. The Nature of the Officers' Injuries

¶ 65        Defendant contends that Watson's and Edwards's injuries were too *de minimis* to satisfy the statute. Photographs in evidence depicted the officers' injuries. Edwards's left forearm was scraped up to the elbow and covered in blood. Other photographs depicted scrapes on his knees that broke the skin. Photographs depicted a circular, red, penetrating wound on Watson's left palm and discernible bruises on her arm and leg. Defendant cites legislative history in which a senator opined that "great bodily harm" would be required. However, we resort to aids of construction only where a statute is ambiguous. *Board of Education of Springfield School District No. 186 v. Attorney General*, 2017 IL 120343, ¶ 25. Here, defendant does not argue that the statute is ambiguous.

¶ 66        The statute provides that the defendant's violation must be the proximate cause of "injury" to the officer. 720 ILCS 5/31-1(a-7) (West 2020). The legislature did not define "injury." Therefore, we assume the legislature intended the term to have its ordinary and popularly understood meaning. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 8 (2009). "Injury" is defined as

"hurt, damage, or loss sustained." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/injury (last visited May 4, 2023) [https://perma.cc/2ZPE-WF78]. "Hurt" is a "wound." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/hurt (last visited May 4, 2023) [https://perma.cc/4Z8G-YN72]. That definition certainly includes the bloody scrape, puncture, and bruises sustained by Edwards and Watson.

¶ 67        Additionally, the legislature did not require that the violation cause great bodily harm, as it has done in other contexts. For instance, aggravated battery occurs where there is "great bodily harm." 720 ILCS 5/12-3.05(a)(1) (West 2020). "[G]reat bodily harm" requires "proof of an injury of a greater and more serious nature than a simple battery." (Internal quotation marks omitted.) *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 63. An elementary rule of statutory construction says that when the legislature uses certain words in one instance and different words in another, it intends a different meaning. *In re Marriage of Paris*, 2020 IL App (1st) 181116, ¶ 38. Consequently, we do not equate "injury" for purposes of the felony resisting statute with "great bodily harm." Had the legislature intended to require great bodily harm, it could have said so. Accordingly, based on this record, we hold that any rational trier of fact could have found all of the elements of resisting a peace officer causing injury.

¶ 68                                III. CONCLUSION

¶ 69        For the reasons stated, we affirm the trial court's judgment.

¶ 70        Affirmed.

¶ 71        JUSTICE TURNER, specially concurring:

¶ 72　　　　While I agree with the majority we should affirm the trial court's judgment convicting defendant of felony resisting a peace officer, I write separately because my rationale for doing so differs in part from the majority's.

¶ 73　　　　As the majority notes, "[a]t trial, the State argued that the officers' attempt to handcuff defendant on the porch was an arrest." *Supra* ¶ 36. The evidence is uncontroverted three police officers were attempting to handcuff defendant while he was on the porch and two of the officers were additionally using a maneuver designed to "sweep" defendant off of his feet. Thus, the evidence supports a finding the officers were attempting to place defendant under arrest, and the trial court, without so specifying, clearly agreed with the State's argument by finding " 'the moment [defendant] resisted them, then that became a crime in and of itself.' " *Supra* ¶ 21. As noted by the majority, our supreme court in *Torres* has held an arrest is an authorized act even if the arrest itself is unlawful. S*upra* ¶ 35. More pointedly, a defendant is not permitted to resist an unlawful arrest. *Jones*, 2015 IL App (2d) 130387, ¶ 11.

¶ 74　　　　Given the foregoing, the trial court, as the trier of fact, properly found defendant guilty of the crime of resisting a peace officer beyond a reasonable doubt based on defendant's initial encounter with and flight from the officers. Moreover, because I agree with the majority's analyses concerning the proximate cause and nature of the officers' injuries, I agree the Class A misdemeanor resisting offenses were correctly elevated to class 4 felonies. See *supra* ¶¶ 54-67.